CASE 17—ON RULE—APRIL 9, 1875.

# In re R. W. Woolley.

### RULE FOR CONTEMPT OF COURT.

1. OFFENSIVE LANGUAGE IN PETITION FOR REHEARING.—Where an offense in the nature of a contempt is committed in the presence of the court, notice to the offender is not usually essential before punishment (7 Wallace, 372); and it is immaterial, where the contempt consists in the use of offensive language, whether it be spoken openly or presented to the court in a written or printed argument. (19 Howard, 13.)

   *A petition for a rehearing* is not a pleading, but an argument addressed to the court and the individual members of the court; and to incorporate into such argument contemptuous, scandalous, or insulting matter, is to commit in open court an act constituting a contempt on the part of the attorney.

2. PURGING A CONTEMPT.—A supposed contempt consisting in mere words which are apparently intended to be scandalous and offensive, but which are susceptible of a different construction, may be explained or construed by the speaker or writer, and on his sworn disavowal of an intention to commit a contempt proceedings against him must at once be discontinued.

3. *But this rule does not hold* where the matter spoken or written is of itself necessarily offensive and insulting. In such case the disavowal of an intention to commit a contempt may tend to excuse, but can not justify the act. (1 Caines, 484.)

4. THE RIGHT OF SELF-PRESERVATION IS AN INHERENT RIGHT IN THE COURTS, not derived from the legislature, and can not be made to depend upon the legislative will.

   Whether the legislature may interfere with the manner in which the courts protect themselves from insults and indignities is doubted and left an open question.

5. STRIKING ATTORNEY FROM THE ROLL.—As a general rule, the right of an attorney to practice law can only be taken from him on the ground that his character or habits have become such that he is no longer fitted to exercise the functions of the position.

6. *But an attorney may unfit himself* for the practice of his profession by the manner in which he conducts himself in his intercourse with

the courts. He may be honest and capable, and yet so conduct himself as to continually interrupt the business of the courts in which he practices, or he may studiously and systematically attempt to bring the tribunals of justice into public contempt.

An open, notorious, and public insult to the highest judicial tribunal of the state, for which an attorney contumaciously refuses in any way to atone, may justify the refusal of that tribunal to recognize him in the future as one of its officers; and in a proceeding against him for contempt, if the contumacy be therein manifested, there is no reason why the order revoking his authority until he does comply with the reasonable requirements of the court may not be made.

7. *In this case* it is adjudged that the rule be made absolute, and that the respondent make his fine to the commonwealth in the payment of the sum of thirty dollars, and that he pay the costs of this proceeding.

Wm. C. P. Breckinridge, . . . . . For Respondent,

CITED

De Hart's Military Law, 293, 294.
Lives of the Chief Justices, vol. 2, pp. 312, 246.
Cowper, 289, *Ex parte* Brownsall.
Salkeld, 84.          12 Modern, 511.
Wilmot's Opinions, pp. 257, 258.
Bumbury's Exch. R. 244, Wilkins v. Edson.
Douglass, 516, Rex v. Vaughn.
Supp. to Viner's Abr. vol. 2, p. 245.
9 Wheaton, 530, Burr's case.
7 Porter, 395, Dorsey's case.
1 Cal. 143, The People v. Turner.
4 Wallace, 379, *Ex parte* Garland.
8 Bush, 88, Walker v. Commonwealth.
1 Mich. 398, *In re* Mills.
7 Wallace, 372, *Ex parte* Bradley.
3 Greene (Iowa), 551, Perry v. The State.
1 Chitty's Pleading, 272.
2 Milne & Craig, 169, Charlton's case.
1 Howard (Miss.) 307, *Ex parte* Brown.
5 Rawle, 191, Austin's case.
1 Mumf. 481, Leigh's case.
1 Cal. 154, Field's case.
1 Wheeler's Cr. Ca. 519, Levi Burr's case.
1 Wheeler's Cr. Ca. 330, Stryker's case.

4 Foster, 154, Bryant's case. 6 Johnson, 418, 419.

2 Met. 625, Turner v. Commonwealth.

1 Abbott's Ad. R. 508, The Laurens Case.

2 Bacon's Abridgment, "Courts," E.

1 Comyn's Digest, "Attorney," B. 15.

2 J. J. Mar. 574, Bickley v. Commonwealth.

7 Dana, 181, Maguire v. Maguire.

1 Ventris, 331, Parker's case.

1 Littell, 374, Johnson v. Moore.

2 B. Mon. 484, Fenwick v. Macey.

2 Strange, 1197, Dyson v. Iremonger.

3 City H. Rec. N. Y. 64, Matter of Van Hook.

2 Johns. 290, People ex rel. Lewis v. Few.

1 Curtiss, 190, Pittman's case.

4 Blackstone's Com. 287, 509.

2 Gallison, 313, Dodge's case.

22 Arkansas, Beene v. The State.

19 Howard, 13, *Ex parte* Secombe.

11 Ohio, 430, State v. Chapman.

12 Fla. 278, State v. Kirk.

18 B. Mon. 472, Rice v. Commonwealth.

67 Penn. St. 204, Dickens's case.

20 Cal. 430, Fletcher v. Dangerfield.

28 Ind. 48, Smith's case. 63 N. C. 408, Moore's case.

JUDGE LINDSAY DELIVERED THE OPINION AND JUDGMENT OF THE COURT.

March 18th, 1874, this court affirmed the judgment of the Louisville Chancery Court in the case of Reamer and others v. Gray, &c.* At the request of R. W. Woolley, who was the attorney for Gray, the time was extended by the chief justice to the 4th day of June to enable him to prepare and file a petition for a rehearing of the appeal. On that day, on motion of Woolley, further time was given him to have the petition printed. At the same time he sued out a writ of *certiorari* to supply a diminution of the record. On the 27th of June the petition was presented and filed by Woolley in open court.

---

* The opinion of this court in the case of Gray v. Reamer, &c., is published in this volume, page 113.

Having reason to suppose that the court regarded portions of the petition as insulting and scandalous, Woolley determined to present an amended or supplemental petition "denying that he intended to be disrespectful, and withdrawing all which the court deemed offensive."

This fact was communicated to the members of the court, and for that reason the petition was considered and acted upon, and no action taken with regard to the scandalous and offensive matter which it contained.

The motion for a rehearing was overruled on the 1st day of July, and immediately after the order overruling it was directed to be entered Woolley presented in the shape of a statement the supplemental petition or statement which it had previously been intimated to the members of the court he desired to file. Upon examination this paper was found to be altogether different in character from that which the court had reason to expect. It was regarded as an aggravation of the original offense, and on the 2d of July a rule was issued against Woolley requiring him to show cause why his authority to act as an attorney and officer of this court should not be revoked, and he otherwise punished for the contempts committed by the filing of the petition and statement.

On the 8th day of September, 1874, the time at which the rule was made returnable, Woolley filed his response. This was not deemed satisfactory, and an order was then made allowing the respondent to be heard orally upon these propositions:

*First*—As to whether he is guilty of the alleged contempts.

*Second*—As to the regularity of the proceedings against him.

*Third*—As to the power of this court in the premises.

At the instance of his counsel the matter was set for hearing on the 8th day of October last.

Appreciating the delicacy of the position in which it is placed, the court has given to this matter the most serious consideration. Its conclusions will now be announced.

In re R. W. Woolley.

Respondent insists that the rule is not sufficiently specific; that it does not specifically aver or state the language deemed disrespectful and insulting, and does not in terms set out the charges and imputations regarded as offensive.

These objections are attempted to be supported by cases in which the alleged contempts were brought to the notice of the court by information. In most of them the acts were done or the words spoken or written out of court. In all such cases the proceedings are in the nature of penal prosecutions, and of course it is proper and generally essential that the information shall state facts constituting a contempt.

But when the offense is committed in the presence of the court notice to the offender is not usually essential (7 Wallace, 372); and it is indifferent in such a case whether the offensive language be spoken openly or presented to the court in a written or printed argument. In *Ex parte* Secombe (19 How. U. S. S. Court Reports, 13) an attorney, for acts committed in the presence of the court, was disbarred without notice of the proceeding and without being heard in his defense, and yet the supreme court held that the order disbarring him was not void, as it necessarily would have been if notice had been essential under the circumstances to give the district court jurisdiction.

Woolley's offenses were committed in the presence of the court. The petition for a rehearing is not a pleading, but an argument addressed to the court and to the individual members of the court. His statement was in most respects personal to himself and was intended to be so considered. The petition was the counsel's argument in support of the motion for a rehearing, and the counsel, and not the client, is responsible to the court for the character of the argument and for the insinuations, imputations, and charges which the petition may contain. Written or printed arguments, whether in the shape of briefs or petitions for a rehearing, are filed in open court, are signed by counsel, and are addressed to the court just as oral argu-

ments are addressed, and to incorporate into such arguments contemptuous, scandalous, or insulting matter is to commit in open court an act constituting a contempt.

By the rule recognized by the supreme court in Secombe's case respondent was not technically entitled to notice at all. But regarding that rule as of doubtful propriety, and not wishing to be instrumental in introducing it into the practice of the courts of this state, we caused him to be notified to appear, and offered him such opportunities to be heard as he and his counsel desired.

The object in citing him to appear was not to enter into an inquiry as to whether at some time or place out of court he had, by acts or words spoken, written, or printed, committed a contempt of the court, but to afford him an opportunity to purge the contempt committed in court by explanation, apology, or retraction, or, in case of his refusal or failure to do so, to allow him to show cause why punishment should not be inflicted.

As no inquiry as to the facts of the transaction or transactions was to be made, an information conforming to the rules of criminal pleading was altogether unnecessary.

The precedent of Lord Cottingham in the case of Lechmere Charlton (2 Milne & Craig, 317) was followed in this case. Charlton, who was a barrister, addressed to the master of the rolls a letter relating to a matter pending before him. He also wrote to the lord chancellor a letter touching the same subject.

The lord chancellor directed an order to be made requiring him to show cause why he should not be committed for contempt.

The order stated "that one of the masters of the court had received a letter directed to him and signed 'E. L. Charlton,' containing matter scandalous with respect to the said master, and an attempt improperly to influence his conduct in the matter pending before him; and that his lordship had received a

letter addressed to himself, dated Ferdale's Hotel, Palace Yard, 9th November, 1836, and signed 'E. L. Charlton,' acknowledging that he, the said E. L. Charlton, was the writer of the said letter dated the 24th of October, 1836; and also the affidavit of Joseph Parkes, proving the said letters to be of the handwriting of Edmund Lechmere Charlton, being read, his lordship, upon taking said matter into consideration, and deeming the conduct of the said Edmund Lechmere Charlton therein a contempt of this court, doth think fit, and so orders, that the said Edmund Lechmere Charlton, having personal notice hereof, do show cause unto this court the 22d day of November, instant, why he should not be committed to the Fleet for his said contempt, and that he do then personally attend this court."

It will be observed that this order does not set out the language contained in the two letters; that it does not explain the character of the improper attempt to influence the master, nor in what the "scandalous matter" consisted; yet it was deemed sufficient by the lord chancellor to warrant him in committing Charlton, who was a member of parliament, to prison.

Afterward a committee of privilege, which was raised by the House of Commons upon Charlton's application, after a thorough investigation of the matter, reported that they were "of opinion that Mr. Charlton's claim to be discharged from imprisonment by reason of privilege of parliament ought not to be admitted."

The order of this court requiring the respondent to show cause is as specific as that in Charlton's case. It is in these words:

"THE COMMONWEALTH OF KENTUCKY, }
    COURT OF APPEALS, July 2, 1874. }

"Whereas, Robt. W. Woolley, an attorney and officer of this court, did, on the 27th day of June, 1874, while exercising his functions and privileges as attorney and officer aforesaid,

file in open court a printed petition for a rehearing of the appeal in the case of P. D. B. O. Gray v. J. M. Reamer and others, then pending therein, which contains language not only disrespectful, but insulting to the court; and whereas, on the 1st day of July, the said Woolley, of his own motion, filed in open court a paper denominated or styled 'Statement of R. W. Woolley,' in which, while disclaiming intentional disrespect to the court in the matter of the petition in the case of Gray v. Reamer and others, he reiterates some of the most offensive charges and imputations contained therein;

"Now therefore the said Robert W. Woolley, attorney and officer aforesaid, is hereby ruled and required to appear in the Court of Appeals, at the capitol in Frankfort, on the 8th day of September, 1874, and show cause, if any he can, why his authority to practice as an attorney and officer of said court shall not (on account of the filing of said petition and statement) be revoked, and he be otherwise punished for the contempt hereinbefore set out."

The papers containing the disrespectful and insulting language are named, and the attention of respondent called to the fact that the contempt consisted in the matter addressed through those channels to the court.

When he appeared he was heard, without restriction as to time, as to his guilt, as to the regularity of the proceeding against him, and as to the power of the court to inflict punishment upon him. Throughout the entire proceeding the court scrupulously observed the British and American precedents, and in every case in which the propriety of a rule of practice is open to doubt it has been relaxed in favor of respondent.

On the back of the printed petition respondent caused to be printed, over his own name, these words: "It is not just to overlook the facts in the record." ·

The same words are again printed on the first page of the petition, and respondent then proceeds: "Your honors have rendered an unjust decree.  The opinion is not in accordance with the facts of the case, and will be a source of regret to this court.  The record has not been carefully examined and hundreds of pages have been entirely overlooked.  Facts have been assumed which have no place in the proof, and others have been ignored which stood out on every page.  With profound respect, not simulated, but real, I say that I fear this honorable court was more attracted by the argument of counsel than by the literature of the record.

"I must not be misunderstood by these remarks.  It is not in me or of me to cast reflections upon this honorable court.  To do so were unprofessional, and I cherish no sentiment in accord with such a course.  But the very aim and purpose of a petition for rehearing, the very nature of its existence, is to subject the action of the bench to a temperate but searching criticism of the bar.  Wherefore, in obedience to my sworn and earnest duty to shield my client against injustice, I say, with abundant deference and unfeigned respect, that the opinion which this honorable court has rendered contradicts the undisputed facts on two hundred and fifty pages of record.  My only excuse for making such statements is their truth, and I must now prove that they are true."

Then follows the argument that respondent saw proper to submit.  After which he concludes:

"Your honors reversed the chancellor upon the law and reversed him upon the facts, and then affirmed all he decided.  This can only be explained upon the ground that it takes two negatives to make an affirmative.

"But there is still worse behind.  It is not the custom to copy vouchers in full in the records taken to this court.  The report of the commissioner or comments of the chancellor have usually been considered sufficient copies.  But after I

saw the irregular opinion in this case I sued out a *certiorari*, and had brought to this court certified full copies of one hundred and thirty-one vouchers, running through the whole existence of the trust, and filling more than one hundred pages. *Every one of these vouchers shows that Henry Gray alone held the funds, and that Ormsby * Gray is as completely a stranger to them as the learned and respected judges of whom I am begging accurate justice.* And yet your honors say not that the evidence is conflicting or insufficient, but that my client 'wholly failed to prove' that Henry Gray received the money.

" I have tried to be respectful, because I feel so; but I have a right to complain of negligent reading of the record, and to appear in this honorable court and stand *pro testem* for the bar. A ruinous and disastrous decree has been rendered against my client, who is proved to be as wholly innocent of all offense as those whom I have the honor to address. Indifference to the record may work his ruin, but it will not elevate the cause of administrative justice.

"All this is careless. It is very hard for my client that the record is not read as accurately by the bench as it was prepared by the bar. No error should be allowed to soil the judgment of an upright and impartial court, and to avoid that in this case a rehearing should be instantly granted, so that the former opinion may do no wrong to a suitor at the bar."

The supercilious and dogmatic style which the respondent saw proper to adopt would not have received the slightest notice; but the charges so distinctly and directly made that the court had overlooked the facts of the case; that it had assumed facts having no place in the proof, and ignored others which stood out on every page of the record; that it was careless and indifferent to the rights of a litigant, and that the result of this carelessness and indifference was a ruinous, disastrous, and unjust judgment against a party wholly innocent of all

---

* P. D. B. O. and Ormsby Gray are the same.

offense, were of a nature too grave to be silently overlooked. These specific charges illustrate the fact that the respondent, by the opening sentence of his petition that "your honors have rendered an unjust decree," did not mean that injustice had been done his client because the court had misapprehended the facts or failed fully to master the law of the case, but that the unjust decree was the natural if not the necessary consequence of carelessness or indifference upon the part of the court.

It is neither necessary nor proper that we shall in this proceeding defend the court against these charges. Upon a re-examination of Gray's record it was fully satisfied with its judgment upon the facts of the case, and more than ever convinced that the pleadings did not present and were not intended to present the defense which respondent insisted in this court had been established by the proof upon which the chancellor had acted.

There are certain inaccuracies in the statement of facts made by the respondent which, though unimportant in themselves, so far as the interests of his client were concerned, serve further to illustrate the *animus* of his petition.

It is said that the opinion "contradicts the undisputed facts on two hundred and fifty pages of the record."

The original record, and the only one before this court prior to the filing of the petition for a rehearing, contained (inclusive of the index) just one hundred and twenty-one pages. The supplemental record which was filed June 4th, 1874, more than two months after the judgment had been rendered and the opinion delivered, contained only one hundred and nine additional pages.

It is said that the court decided that respondent's client "wholly failed to prove" that Henry Gray received the money of the *cestuis que trust.*

The language of the opinion is that the burden was on his client "of proving that although he joined in the sale to Rob-

inson, and acted as trustee in making re-investments, *Henry W. Gray alone collected and controlled the money in controversy. This he wholly failed to do."*

When it is understood that respondent's client was seeking upon his appeal to escape liability to the beneficiaries of a trust, upon the ground that as co-trustee he had joined in receipts or in the execution of conveyances merely for conformity or to transfer titles from himself, and had not actively participated in the execution of the trust nor in the management and control of the trust estate, the effect of substituting the word "received" for the words "collected and controlled," which were the words used by the court, will be readily seen and appreciated.

Again respondent says that after he saw the "singular opinion in this case" he sued out a *certiorari* and had brought before the court full copies of all the vouchers on file in the lower court. He then italicizes the assertion that "*every one of those vouchers shows that Henry Gray alone held the funds, and that Ormsby Gray is as completely a stranger to them as the learned and respected judges of whom I am begging accurate justice,*" and concludes the sentence with these words, "And yet your honors say, not that the evidence is conflicting or insufficient, but that my client wholly failed to prove that Henry Gray received the money;" thus disingenuously attempting to make it appear that these vouchers were before the court when it decided that appellant's client had "wholly failed to prove" that "Henry W. Gray alone collected and controlled the money in controversy."

But waiving further consideration of the inaccurate statements contained in the petition and of its general tone, it is sufficient to say that the direct charges and the unmistakable imputations before referred to were in their nature offensive and insulting, and that the court was compelled, from the circumstances of the case, to regard the respondent as having

abused his privileges as one of its attorneys and officers, and therefore as guilty of a contempt.

For the professed purpose of removing from the minds of the members of the court the belief that he had intentionally reflected upon their conduct whilst acting in the discharge of their official duties, he filed the statement of July 1st, 1874, in which he said, "I have one other ground why this amendment should be filed. The respected counsel, in his reply, has construed my petition as reflecting disrespectfully upon the conduct of this court, and I have some reason to fear that a similar erroneous impression has been made upon the minds of your honors. No such motive impelled me, no such purpose guided me; I am incapable of incivility to this honorable court. I know full well the respect which the bar owes to the bench, and I will always pay it; I know full well the respect which the bench owes to the bar, and I purpose always to have it. But when the defense of my client has been unheard or not understood, and a crushing judgment has been rendered against him when he has done no wrong, it may be that in the zeal of earnest advocacy I may have chosen words harsher than the thoughts that caused them or the motive that impelled their utterance.

"I disclaim all offense to this honorable court, and yield profound respect; but I declare that my client should be heard again, because, as I believe, and as my learned opponent tacitly admits, the statement of facts in the judgment are misconceptions of the facts in the record.

"If any expression in the petition is considered by the court as intended to be offensive or as liable to such a construction, I desire to withdraw such expression, as my own self-respect, as well as my respect for the court, would at all times prevent me from being intentionally guilty of any disrespect.

"Wherefore that I may be relieved of an offense which I

can not commit—that of disrespect to this honorable court—
and that full justice may be done to a suitor who is without
blame, I ask that this statement may be filed and that my client
may be heard once more in his just defense."

Although in this seeming retraction the respondent carefully
discriminated between the "expressions" used in the petition
and the charges and imputations which he could not but have
known constituted the real ground of offense, it would have
been accepted as sufficient, except that he reiterated the asser-
tion that his client had "been unheard," qualified, it is true,
with the alternative proposition "or not understood," and the
further fact that although up to that time the court had taken
no steps in the matter, and had, at the instance of a common
friend of the respondent and of its members, delayed action to
enable him to "file an amended petition denying that he in-
tended to be disrespectful, and withdrawing all words which
the court deemed offensive," he saw proper to further manifest
his want of respect for and his disposition to defy the authority
of the court by reminding it that whilst he knew the respect
which the bar owed to the bench, and intended always to pay
it, he also knew full well the respect which the bench owed to
the bar, and proposed always to have it. It is not complained
that the court had treated the counsel discourteously; and in
view of the liberal extension of time given him to prepare his
petition and the further extension granted to enable him to
print it, all this was purely gratuitous and wholly unprovoked.
It was in keeping with the tone and temper of the offensive
petition.

The court could not escape the conclusion that notwithstand-
ing the disclaimer of intentional disrespect the withdrawal was
made with reluctance, and that its effect was intended to be
neutralized by the accompanying matter and by the manner
in which it was made.

Hence it was that the rule was issued. In response to the

rule, respondent pretended that he did not intend to be disrespectful to the court nor to its members; says that he acted in good faith, without design, wish, or expectation of committing any contempt or offering any disrespect to the court; that after he filed the petition he had reason to believe that the court considered it disrespectful, and he felt it alike due to the court and himself to disavow any such intention, and to withdraw any "expression" which could be so construed; and for that purpose he prepared the statement filed July 1st, which he then intended to be and believed was a full and explicit disavowal of any intention to be disrespectful; and he denied that in said paper there was any reiteration of any charge or imputation which was intended to be offensive, or any language which was, or was intended to be disrespectful or offensive, and disavowed that either in the petition for rehearing or in said statement he intended to be disrespectful. This disavowal he made as due to himself as well as to the court.

It will be observed that respondent is again careful to say that he intended by his statement to withdraw the "expressions" regarded by the court as offensive. The term was used, as we are persuaded, with deliberation. Other words were first written and then erased or obliterated, so that they can not be made out, and the term "expressions" substituted for them.

With the record in this condition respondent's counsel insists that the proceeding against his client should be dismissed, because he has purged himself of the alleged contempt by denying upon oath that he intended to be disrespectful, discourteous, or insulting to the court. We recognize, to the utmost reasonable limit of its application, the rule that a supposed contempt consisting in mere words, which are apparently intended to be scandalous and offensive, but which are at all susceptible of a different construction, may be explained or construed by the speaker or writer, and that upon his sworn

disavowal of an intention to commit a contempt proceedings against him must at once be discontinued.

But this rule does not control where the matter spoken or written is of itself necessarily offensive and insulting. In such a case the disavowal of an intention to commit a contempt may tend to excuse, but it can not and will not justify the act. (The People v. Freer, 1 Caines, 484.)

An intention to be offensive in manner may be disavowed, and the particular language used to make the charges or imputations may be withdrawn, but the effect of the paper or publication, the ideas conveyed, the charges and imputations made, may remain. We can not escape the conclusion that respondent had reason to believe that the disavowal and retraction made by him would have the effect indicated, and nothing more.

Respondent's counsel calls our attention to the language used by Mr. Wirt in defending Judge Peck before the high court of impeachment. Speaking with regard to attachments for contempt Mr. Wirt said: "The party called before the court is made his own witness in his own cause. If he be innocent he will have no trouble in disclaiming the contempt and avowing his innocence. The question is the *quo animo*. His purpose is known to himself, and he is permitted to purge himself by his own avowal. If a man has inadvertently taken a step which subjects him to the imputation of a contempt of court when in truth he had no such design, what indignity can an ingenuous mind feel in explaining the transaction and disavowing any intention of contempt toward the public tribunals of his country? In private intercourse of gentlemen such an explanation is not thought derogatory. A brave, generous, and honorable man feels no difficulty in making it, even in private life. Nor can I imagine that any well-regulated mind, conscious of its innocence, would feel the slightest difficulty in making it to a court of justice. On the contrary, I should

imagine that such a one would be gratified with the opportunity of avowing his innocence. And on such an avowal we know that there is at once an end of the proceeding."

In the case in hand this court has been offered no explanation whatever. An ingeniously drawn statement and response, which at most amount to but a qualified withdrawal of the offensive matter, unaccompanied by explanation or apology, is the only reparation which respondent is willing to make to this tribunal.

We may assume from the quotation just made, which is taken from the brief and argument of respondent's counsel, that in his private intercourse with gentlemen he (respondent) would not have regarded an explanation, under the circumstances, as at all derogatory. Yet he declines to explain to this court, and still his counsel insists that the contempt has been purged and that proceedings should therefore be at once discontinued.

We will barely notice one other of the points argued. It is claimed that this court has no power to revoke the authority heretofore granted to Woolley to practice before it as one of its officers and attorneys, as a punishment for a contempt.

*First*—Because the power of the courts to punish for contempts is limited by the provisions of article 27, chapter 29 of the General Statutes to a fine not exceeding thirty dollars and imprisonment not exceeding thirty hours, unless the party is tried by a jury. We will not in this case determine whether under the constitution the legislative department, under the guise of regulating proceedings in cases of contempts, can take from the judiciary the power to preserve its independence and equality by protecting itself against insults and indignities. The right of self-preservation is an inherent right in the courts. It is not derived from the legislature, and can not be made to depend upon legislative will. The power of the legislative departments to interfere with the manner in which

the judicial department shall protect itself against insults and indignities is denied by the Supreme Court of Arkansas (State v. Morrell, 16 Ark. Rep. 384), and doubted by the Supreme Court of the United States. (*Ex parte* Robinson, 19 Wallace, 510.) It remains an open question in this state, and we intend in this case to so leave it.

*Second*—The power to revoke respondent's said authority is denied upon the ground that such a right can only be taken from one to whom the privileges of an attorney have once been granted, upon the ground that his character or habits have become such that he is no longer fitted to exercise the functions of the position.

This general proposition is correct. But an attorney may unfit himself for the practice of his profession by the manner in which he conducts himself in his intercourse with the courts. He may be honest and capable, and yet he may so conduct himself as to continually interrupt the business of the courts in which he practices; or he may, by a systematic and continuous course of conduct, render it impossible for the courts to preserve their self-respect and the respect of the public, and at the same time permit him to act as an officer and attorney. An attorney who thus studiously and systematically attempts to bring the tribunals of justice into public contempt is an unfit person to hold the position and exercise the privileges of an officer of those tribunals. An open, notorious, and public insult to the highest judicial tribunal of the state, for which an attorney contumaciously refuses in any way to atone, may justify the refusal of that tribunal to recognize him in the future as one of its officers; and in a proceeding against him for contempt, if the contumacy be therein manifested, there is no reason why the order revoking his authority until he does comply with the reasonable requirements of the court may not be made.

We have no disposition to resort to extreme measures in

this case. The avowal under oath by the respondent that he did not mean to commit a contempt, and his further declaration that he does not know the offensive imputation or charge recited in the rule to be in the " statement," although they can not justify, may be regarded as in some degree palliating the offense. At any rate this court will so treat such avowal and declaration.

It is adjudged that the rule be made absolute, and that the respondent, R. W. Woolley, make his fine to the commonwealth in the payment of the sum of thirty dollars; that he pay the costs of this proceeding; and that this judgment may be enforced by execution or *capias pro fine*, as the court may direct.