(January 2, 1913.)

D. C. McDOUGALL, Attorney General of the State of Idaho, Plaintiff, v. R. S. SHERIDAN, C. O. BROXON and A. R. CRUZEN, Defendants.

[128 Pac. 954.]

CONTEMPT—INFORMATION—SUFFICIENCY OF—DEMURRER TO—STATE AS A PARTY—CAUSE PENDING—INHERENT POWER OF THE COURT—JURY NOT REQUIRED—DUE PROCESS OF LAW—ANSWER OF CRUZEN—ANSWER OF SHERIDAN AND BROXON—SUFFICIENCY OF EVIDENCE.

(Syllabus by the court.)

1. *Held,* that the information states facts sufficient to charge contempt.

2. The editorials and articles on which this proceeding is based directly charge that the court corruptly rendered the decision in the Spofford-Gifford case, and that it was rendered by reason of a political trade or bargain and not on the law and facts. By such publications there was an attempt by wanton defamation and falsehood to insult and intimidate the judges, degrade the court and destroy its power and influence and inflame and prejudice the people.

3. *Held,* that said publications were a direct attack upon the court as a court, and that the court, as a court, could not bring a private action to protect itself, and that its only means of maintaining its authority is by contempt proceedings.

4. The "liberty of the press" is not guaranteed by the constitution against the publication of deliberate falsehood and misrepresentation in regard to decisions of courts, even though the publishers may think that public and political interests would be subserved by such falsehood and misrepresentation.

5. The public press has no more license or right to publish falsehood and defamation than has a private individual.

6. The liberty of the press is only the liberty which every man has to utter his sentiments, and can be enjoyed only in subjection to that precept both of law and morals, "So use your own in order that you may not injure another's."

7. This proceeding is not criminal action, and the statutes of the state do not require that such a proceeding be brought in the name of the state.

8. *Held,* that the Spofford-Gifford case was pending until the 23d day of October, 1912, when the petition for rehearing was denied, and that many of said editorials and articles were published prior to that date, and that those published after said date were attached to said information simply to show the malicious and vicious intent of the defendants.

9. A person charged with contempt is not entitled to a jury trial, and the statutes regarding informations, indictments and the trial of criminal cases are not applicable to contempt proceedings.

10. The power of the court to punish summarily for contempt is essential to its very existence, and that right exists without the interposition of a jury.

11. The inherent power of the court to punish for contempt was not derived from the legislature, and such power does not depend upon the legislative will.

12. The legislature has not the authority to restrict the inherent power of the court to punish for contempts, and it cannot abridge such power, so far as courts of record are concerned.

13. "Due process of law" does not require a jury in contempt proceedings, and there is no necessity for calling upon a jury to assist the court in the exercise of that power.

14. The legislature may prescribe any reasonable procedure to be followed in contempt prosecutions, but it has failed to provide any procedure, and under the provisions of sec. 3925, Rev. Codes, when the procedure is not provided by the legislature, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the code.

15. Under the provisions of sec. 5168, Rev. Codes, the judgments and orders of the court or judges in cases of contempt are made final and conclusive.

16. Where certain acts of contempt are made a crime under our statute, the making of such acts punishable as crimes does not affect any power conferred on the court to impose or inflict punishment for contempt. (Sec. 6305, Rev. Codes.)

17. Sec. 6529, Rev. Codes, provides that certain contempts are misdemeanors, and sec. 7231 provides that a criminal act is not the

less punishable as a crime because it is also declared to be punishable as a contempt.

18.   The freest criticism of all decisions of the court is allowed and invited, but criticism ceases and contempt begins when malicious slander, vilification and defamation bring the courts and the administration of the law into dishonor and disrepute among the people.

19.   Art. 1, sec. 9, of the state constitution, provides that "Every person may freely speak, write and publish on all subjects, *being responsible for the abuse of that liberty.*" While certain liberty is there guaranteed, in the last clause of said section the responsibility for the abuse of that liberty is fixed.

20.   Said section is not and cannot be made a refuge for malicious slanderers and libelers.

21.   *Held*, that the evidence is sufficient to show that the defendants are guilty of wilful contempt of this court.

(Ailshie, J., concurs in part and dissents in part.)

Original contempt proceedings. Defendants found guilty of contempt.

D. C. McDougall, Attorney General, and J. H. Peterson, Assistant, for Plaintiff.

A publication pending a suit, reflecting on the court, the parties to the suit, the witnesses, the jurors or the counsel, is a contempt of the court. (*Hollingsworth v. Duane,* Wall. Sr. 77, 102, Fed. Cas. Nos. 1616–1618; *In re Bronson,* 12 Johns. (N. Y.) 460; *Respublica v. Passmore,* 3 Yeates (Pa.), 441, 2 Am. Dec. 388.)

A contempt arises by speaking or writing contemptuously of the court or of the judges acting in their judicial capacity. (4 Bl. Com. 283.)

And although the defendant declares that no contempt was intended. ( *In re Hughes,* 8 N. M. 225, 43 Pac. 692.)

Publications concerning a pending cause, trial or judicial investigation, calculated to prejudice or prevent fair and impartial action, which seek to influence judicial action by threats, or other form of intimidation, which reflects upon the court, counsel, parties or witnesses, respecting the cause, or which tend to corrupt or embarrass the due administration of

justice, constitute contempt. (9 Cyc. 20; *In re Providence Journal Co.*, 28 R. I. 489, 68 Atl. 428, 125 Am. St. 755, 17 L. R. A., N. S., 582.)

Independent of authority given by statute, courts of record of superior jurisdiction, whether civil or criminal, possess inherent power to punish for contempt of court. Such power is essential to due administration of justice, and the legislature cannot take it away or abridge it, although it may regulate its use.

Statutes conferring the power are simply declaratory of the common law. (9 Cyc. 26, and cases cited; *State v. Howell*, 60 Conn. 668, 69 Atl. 1057, 125 Am. St. 141, 13 Ann. Cas. 501; *In re Dunn*, 85 Neb. 606, 124 N. W. 120; *In re Woolley*, 11 Bush (Ky.), 95; *State ex rel. Attorney General v. Hildreth*, 82 Vt. 382, 74 Atl. 71, 137 Am. St. 1022, 18 Ann. Cas. 661, 24 L. R. A., N. S., 551.)

In most of the cases holding that courts are limited in punishment to statutory regulations, it is found, upon close examination, that the court had before it contempts of inferior courts. (*Stuart v. People*, 4 Ill. 395; *State v. Galloway*, 5 Cold. (Tenn.) 326, 98 Am. Dec. 404; *Ex parte Edwards*, 11 Fla. 174; *In re Chadwick*, 109 Mich. 588, 67 N. W. 1071; *Hale v. State*, 55 Ohio St. 210, 45 N. E. 199, 60 Am. St. 691, 36 L. R. A. 254 (see note); *Holman v. State*, 105 Ind. 513, 5 N. E. 556.)

"The power to punish for contempt is an incident to all courts of justice, independent of statutory provisions." (*People v. Wilson*, 64 Ill. 195, 16 Am. Rep. 528.)

A court has jurisdiction of cases before it on appeal until the *remittitur* is issued. (Haynes' New Trials and Appeals, sec. 293, and cases cited.)

A contemptuous publication made after the rendition of an opinion and after the time for rehearing has elapsed is, nevertheless, made concerning a pending suit if time still remains for application for modification of the opinion. (*State v. Tugwell*, 19 Wash. 238, 52 Pac. 1056, 43 L. R. A. 717; *In re Chadwick*, 109 Mich. 588, 67 N. W. 1071; *Fishback v. State*, 131 Ind. 304, 30 N. E. 1088.)

Criticism of a judge, referring to his official conduct in matters disposed of, is held to be contempt. (*State ex rel. Attorney General v. Circuit Court,* 97 Wis. 1, 72 N. W. 193, 65 Am. St. 90, 38 L. R. A. 554; *Ex parte Steinman,* 95 Pa. 220, 40 Am. Rep. 637; *State v. Kaiser,* 20 Or. 50, 23 Pac. 964, 8 L. R. A. 584; *In re Shannon,* 11 Mont. 67, 27 Pac. 352; *Jackson v. State,* 21 Tex. 668; *Ex parte Cole,* 1 McCrary, 405, Fed. Cas. No. 2973.)

The following cases held that it amounts to contempt of court publicly to criticise and impute to a judge want of integrity because of his official conduct, even with respect to matters then terminated: *In re Chadwick,* 109 Mich. 588, 67 N. W. 1071; *Burdett v. Commonwealth,* 103 Va. 838, 48 N. E. 878, 106 Am. St. 916, 68 L. R. A. 251; *State ex rel. Crow v. Shepherd,* 177 Mo. 205, 76 S. W. 79, 99 Am. St. 624; *Commonwealth v. Danbridge,* 2 Va. Cas. 408; *State v. Morrill,* 16 Ark. 384; *United States ex rel. Guaranty Trust Co. v. Gehr,* 116 Fed. 520.

While a newspaper, as well as any citizen, may discuss the opinion of the supreme court and may criticise their reasoning or question by open argument the soundness of their conclusions, a misstatement of such conclusions constitutes a contempt for which the newspaper may be punished. (*In re Providence Journal Co., supra.*)

Where words are offensive and insulting *per se,* the offender may be punished, and the disavowal of any intention of disrespect cannot justify. (*In re Breen,* 30 Nev. 164, 93 Pac. 1002, 17 L. R. A., N. S., 572; *People v. Wilson, supra.*)

Criminal intent is not essential to constitute the publication of a newspaper article tending to obstruct the administration of justice a contempt, though absence of such intent may be considered in mitigation of the offense. (*State v. Howell,* 80 Conn. 668, 69 Atl. 1057, 125 Am. St. 141, 13 Ann. Cas. 501; *In re Fellerman,* 149 Fed. 244.)

The provision in the constitution of the United States that the trial of all crimes shall be by jury does not take away the right of courts to punish contempt in a summary manner. The provision is to be construed to relate only to those crimes

which by our former laws and customs have been tried by jury. (*Hollingsworth v. Duane,* Wall. Sr. 77, 186, Fed. Cas. No. 6616–6618.)

Bogart & Hasbrouck and J. J. Plowhead, for Defendants Sheridan and Broxon, cite generally the following cases, without stating in brief on what points cited: Rapalje on Contempt, secs. 93, 94; Cooley, Const. Lim., p. 520; *Galland v. Galland,* 44 Cal. 475, 13 Am. Rep. 167; 28 Am. Law Review, 122; *Rex v. Freeman's Journal,* 2 Ir. Rep. (1902) 82; *Cheadle v. State,* 110 Ind. 301, 11 N. E. 426, 59 Am. Rep. 199; *McLeod v. St. Aubyn,* 68 L. J. P. C., N. S., 137, App. Cas. [1899] 549; note to *Burdett v. Commonwealth,* 69 L. R. A. 252 et séq.; *Myers v. State,* 46 Ohio St. 473, 22 N. E. 43, 15 Am. St. 638; 57 Central Law Journal, 102; *Percival v. State,* 45 Neb. 741, 64 N. E. 221, 50 Am. St. 568; *In re Pryor,* 18 Kan. 72, 26 Am. Rep. 747; *In re Sturoc,* 48 N. H. 428, 97 Am. Dec. 626; *Storey v. People,* 79 Ill. 45, 22 Am. Rep. 158; *People v. News-Times Pub. Co.,* 35 Colo. 253, 84 Pac. 912; Oswald, Contempt, 2d ed., 62; *State ex rel. Attorney General v. Circuit Court,* 97 Wis. 1, 72 N. W. 193, 65 Am. St. 90, 38 L. R. A. 554; *Rosewater v. State,* 47 Neb. 630, 66 N. W. 640; *State v. Sweetland,* 3 S. D. 503, 54 N. W. 415; *State* v. *Edwards,* 15 S. D. 383, 89 N. W. 1011; *In re Dalton,* 46 Kan. 253, 26 Pac. 673; *In re Thompson,* 46 Kan. 254, 26 Pac. 674; *Cooper v. People,* 13 Colo. 337, 22 Pac. 790, 6 L. R. A. 430.

Alfred A. Fraser, for Defendant A. R. Cruzen.

The plaintiff has entirely failed to produce upon the trial of this action any evidence whatsoever that this defendant controlled or dictated or had anything whatever to do with the publication of the several articles set forth in the information.

The evidence is insufficient to charge the defendant Cruzen with being guilty of a contempt of court, and the rule as to him should be discharged.

The degree of proof required in cases of this character is the same as that required to be produced by the prosecution

in all criminal cases. (*United States v. Jose,* 63 Fed. 951; *Potter v. Lowe,* 16 How. Pr. 549; *In re Buckley,* 69 Cal. 1, 10 Pac. 69; *Slater v. Merritt,* 75 N. Y. 268; *Accumulator Co. v. Consolidated Electric Storage Co.,* 53 Fed. 796; *Fishback v. State,* 131 Ind. 304, 30 N. E. 1088; *In re Shull,* 221 Mo. 623, 121 S. W. 10, 133 Am. St. 496; *Otis v. Superior Court of Los Angeles County,* 148 Cal. 129, 82 Pac. 853.)

In actions of this kind, where the court in the eyes of the public appears in the light of being the accusers, the jury and the judge, courts have been very careful, for their own protection, to require that the guilt of the accused be established beyond a reasonable doubt. (*In re Clements,* 46 L. J. Ch. 375; *Telegram Newspaper Co. v. Commonwealth,* 172 Mass. 294, 52 N. E. 445, 70 Am. St. 280, 44 L. R. A. 159.)

SULLIVAN, J.—This action involves proceedings for contempt. A verified information by the attorney general of the state, in his official capacity, was filed in this court on the 2d day of December, 1912, charging the defendants, R. S. Sheridan, C. O. Broxon and A. R. Cruzen, with publishing in the "Evening Capital News" certain articles, wilfully and maliciously misrepresenting the position of this court in a certain case then pending before it, entitled *State ex rel. Spofford v. Gifford, Secretary of State,* 22 Ida. 613, 126 Pac. 1060, and charging that said articles wilfully and maliciously misrepresented the court, and that said articles were unwarranted, contemptible, defamatory and a contumacious attack upon the supreme court and the judges thereof, a copy of which information, exclusive of the caption and exhibits, is as follows:

"Comes now D. C. McDougall, as attorney general of the state of Idaho, by order and request of the supreme court of the state of Idaho, and respectfully represents and shows:

"1. That the 'Evening Capital News' is a newspaper published daily at Boise, county of Ada, state of Idaho, said paper having a wide circulation, and being widely read by citizens of the state of Idaho, and especially by citizens of Ada county, aforesaid.

"2. That upon the 8th day of October, 1912, there was filed in the above-named court a certain proceeding and action entitled '*State of Idaho ex rel. Spofford v. W. L. Gifford*, as Secretary of the State of Idaho'; said action and case was decided by the above-named court on the 8th day of October, 1912; motion for rehearing was filed in said matter on October 15, 1912; said petition and motion was denied October 23, 1912.

"3. That the above-named defendant, R. S. Sheridan, is now, and for many years heretofore has been, the owner and business manager of said 'Evening Capital News' aforesaid, and in his capacity as such owner and business manager, in conjunction with defendants Broxon and Cruzen, has, as plaintiff is informed and believes, and therefore alleges, controlled and dictated the policy of said 'Evening Capital News' aforesaid, and has, as aforesaid, commanded, controlled, governed and dictated the matter which has appeared in said newspaper during the time he has acted as such owner and business manager.

"4. That the defendant, C. O. Broxon, is now, and for a long time heretofore has been, the managing editor of said above-described 'Evening Capital News,' and in his capacity as said managing editor has, in conjunction with defendants Sheridan and Cruzen, dictated the editorial policy of said paper, and is and has been responsible, so plaintiff is informed and believes, and therefore alleges, for the editorials appearing in said paper during several years preceding the filing of this complaint and information, and during several years heretofore the defendant Broxon has, as aforesaid, dictated, commanded and controlled the editorials that have appeared in said 'Evening Capital News.'

"5. That defendant A. R. Cruzen, so affiant is informed and believes and therefore alleges, owns or controls a large block of the stock of said newspaper, and in conjunction with defendant Sheridan and defendant Broxon has controlled the policy of said 'Evening Capital News' for several months preceding the filing of this information and complaint; and said defendant Cruzen, plaintiff is informed and believes and

therefore alleges, as aforesaid, has controlled, commanded and dictated the matter that has appeared in said paper during the last several months.

"6. That shortly before the filing of the case mentioned and described in paragraph 2 of this information and complaint, to wit, on September 29, 1912, there appeared and was published in said 'Evening Capital News,' by command of the defendants herein, and each of them, and with their knowledge, consent, connivance, acquiescence and command, an editorial, a copy of which is annexed hereto and made a part of this information and complaint, and marked Exhibit '1'; that said article was intended to influence the supreme court in its decision of said case, which the defendants herein believed was shortly to be filed, and said editorial above described tended to bring the above-described supreme court of the state of Idaho, and the judges thereof, into disrepute, and lessen the respect due the authority to which the said court is entitled; and said editorial was and is unwarranted and contemptible, and is a contumacious attack upon said supreme court and the judges thereof, and is defamatory, and was calculated to impede the administration of justice.

"7. That while the said case described in paragraph 2 of plaintiff's information and complaint herein was pending before said supreme court, there appeared in said 'Evening Capital News,' by command of the defendants herein, and each of them, and with their knowledge, consent, connivance and acquiescence, certain other and further editorials, articles and items, copies of which are annexed to this complaint and made a part thereof, and marked Exhibits Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 and 24; that said last above-described articles, items and editorials, and each of them, tended to bring the above-described supreme court of the state of Idaho, and the judges thereof, into disrepute, and lessen the respect due the authority to which said court is entitled, and said articles, items and editorials were and are unwarranted, contemptible and defamatory, and a contumacious attack upon said supreme court and the judges thereof.

"8. That between October 28 and November 18, 1912, there appeared in said 'Evening Capital News,' by command of the defendants, and each of them, and with their knowledge, consent, connivance and acquiescence and command, certain other and further articles, editorials and items concerning said case, copies of which articles, editorials and items are annexed to this complaint and made a part thereof, and marked Plaintiff's Exhibits Nos. 25, 26, 27, 28, 29, 30 and 31; and said last above-described articles, editorials and items, and each of them, tended to bring the above-described supreme court of the state of Idaho, and the judges thereof, into disrepute, and lessen the respect due the authority to which the said court is entitled, and said articles, editorials and items were and are unwarranted, contemptible and defamatory, and a contumacious attack upon said supreme court and the judges thereof.

"9. That said above-described articles, editorials and items were and are wilful and malicious, and all and each of them is a wilful and malicious misrepresentation of the attitude and holding of said court concerning said cause, and wilfully and maliciously misrepresent the position of the court with reference to said cause and matter; and said articles, items and editorials, and each of them, was intended to and did distort the decision of said court in said matter, and was calculated to impede the administration of justice.

"Wherefore, the plaintiff prays that the citation and process of this court may issue to the above-described defendants, and each of them, and that they be brought before this court to show cause why they should not be punished for contempt, and dealt with as to the court may seem just."

To said information was attached thirty-one exhibits of different editorials and articles published in said "Evening Capital News," the first of which was published on September 29, 1912, and the last on November 18, 1912, all of which related to a decision of this court in the said Spofford case, excerpts from which are as follows:

Exhibit No. 1: " . . . . We have too much confidence in the majority of our supreme court to believe that that tri-

bunal will put any strained construction upon the plain pro-
visions of the law of the state for the very purpose of an-
tagonizing the will of the people who support them in office
and who constitute the bone and sinew of our civilization.

"There are some limits to which our courts and its judges
may go in support of the political organization to which they
have attached themselves, and we do not for one minute be-
lieve that they will use their official powers to place unjust
or unusual construction upon words or take other technical
advantage which may be presented by hireling attorneys of
the special interests in order to deprive the citizens, or any
considerable number of them, of their right to express by
ballot their preferences in governmental affairs.  Whatever
the majority of the justices of our supreme court may do in
a political way, they will do as men and as citizens off the
bench to which they have been elected, and not through the
powers invested in them because of such position.

"It is only by inducing the court to place a strained and
unusual construction upon the plain provisions of the elec-
tion laws of the state that the Republican hirelings of the
special interests will hope to accomplish anything.  They may
not undertake even this, but our experience with the same
class of advocates of government by special privilege classes,
leads us to fear that they will not stop at anything that gives
the least hope of achieving their purpose, which, above all
else, is the prevention of an expression of the will of the peo-
ple, knowing that such an expression means an end to their
government in this state.  The next few days may witness the
first move in the conspiracy."

Exhibit No. 3: " ' . . . . This decision of the supreme
court of our state but aids the Republican organization to
perpetrate another steal from the people, which is in pursu-
ance of the conspiracy to steal the presidency of the United
States.

" 'We shall immediately take steps to inform the people of
Idaho how to vote for the Roosevelt electors in spite of the
criminal effort to disfranchise them.' "

Exhibit No. 6: "The other justices of the supreme court might have known they were wrong when Justice Sullivan agreed with them."

Exhibit No. 7: " . . . . The supreme court at Boise issued an order to the secretary of state to certify to be printed the names of presidential electors for Taft and Wilson as candidates for 'OFFICE'; the same court then went to Lewiston and issued another order in the same case to the secretary of state prohibiting him from certifying to be printed on the ballots the names of presidential electors for Roosevelt because they are not candidates for 'PUBLIC OFFICE.'

"Now, this was the court acting as a court of equity and not as a court of law. It was appealed to to do an equity act and not to await the usual slower processes of a law court. As an act of equity and justice, therefore, the supreme court of the state has said that presidential electors are candidates for 'offices' for the sake of letting the Taft and Wilson electors in, but that presidential electors are not candidates for 'public offices' for the purpose of keeping the Roosevelt electors off the ticket. . . . . "

Exhibit No. 8: " . . . . The technical and strained construction obtained from the supreme court of this state by the Taft forces and the supporters of the stolen convention at Chicago, marks but the real beginning of the Roosevelt and reform movement in Idaho.

"Only the ignorant have been disfranchised by that decision. The intelligent and the patriotic, regardless of past or present political affiliations resent the attempted disfranchisement as an unwarranted encroachment upon the rights of a majority of the people of the state—an encroachment that to-day was upon one class of the people, but which tomorrow or the next day, or the next year, may be extended to other classes of citizens. . . . . "

Exhibit No. 10: "The supreme court of the state clearly failed to comprehend the law which it interpreted so as to prevent the printing of the Roosevelt electors upon the ballot. . . . .

"But where the court painfully failed to construe the law properly but went out of its way to place a misconstruction upon it in order to keep the Roosevelt electors off the ballot, was in reference to section 385, which provides that candidates for 'public office' may be nominated by petition. . . . .

"In holding to the literal, strained, narrow, construction of the words 'state office' in designating how a petition shall be gotten up in order to file a nomination for a 'public office,' the court gave its approval to the plan of the Republican state central committee, the Republican state candidates and the supporters of the Republican machine to disfranchise a very large portion of the people of the state—such a large portion, in our opinion, that it constitutes a clear majority over all."

Exhibit No. 11: " . . . . We are forced to bow to the will of the supreme court, because there is no appeal, except to the people, and it is to the people that the Progressives now make their appeal for a square deal.

"We ask the people to reprove the corrupt and malicious spirit of the Republican state central committee which prompted the action which resulted in the disfranchisement of all too ignorant or too indolent to write four or five names upon the ballot when they go to vote and which has imposed upon the intelligent and patriotic voters of the state the unusual and unfair burden of assuming the task of doing this while their associates, allied with the two old political machines working and laboring to perpetuate the rule of the special interests upon the people, have the advantage of a printed ballot in order to accomplish their purposes.

"To those who do not feel like writing in these names as well as those who do, we appeal to rebuke the spirit which prompted this disfranchisement, by voting for the Progressive state ticket, which will be printed upon the ballots. By voting that ticket the forces of the corporate and special interests in this state will be routed even though Idaho's vote may not be cast toward the accomplishment of the same thing in the nation."

Exhibit No. 12:

## "COLONEL ROOSEVELT APPEALS TO MEN AND WOMEN OF IDAHO.

"J. H. Gipson, Chairman, and Paul Davis, secretary of the Progressive state central committee, last night received the following:

"Chicago, Ill., Oct. 12, 1912.

"Through you I desire to appeal to the men and women of Idaho not to permit themselves to be disfranchised as the court has sought to disfranchise them. It is impossible to protest too strongly against what is literally the infamy of this decision.

"Every upholder of law and order and every sincere well wisher of the cause should take the lead in condemning such utterly reactionary conduct by a reactionary court.

"Absolutely without warrant of law and in the interest only of the great apostles of special privileges in politics and industry, the reactionaries wish to disfranchise the people whom they recognize in the Progressive party as the only party which really and in good faith stands for the people.

"It is an attempt to beat the cause by trickery and chicanery because those who inspired the attempt know that they have no chance of success in a fair and open fight before the people themselves.

"This action by the court has shifted the issue in Idaho to a square issue as to whether or not the people are to be allowed to express their deliberate judgment. It is an attempt to stifle such expression of deliberate judgment by the people.

"It was an infamous thing for the Republican state central committee to bring such an action and the decision by the reactionary, partisan court, before which it was brought was against the law, against equity, against justice and against the whole course of decisions in all our American courts.

"I have a right to ask now that not only every progressive but every honest man and every honest woman in the state stand with us. The Republican state central committee and

the reactionary court are counting upon the hope that individually men and women will not take the trouble to write in the names of the Progressive candidates on the ballot.

"I appeal to the men and women of Idaho to disappoint this hope and frustrate the outrageous conduct of the reactionaries.

"(Signed)    THEODORE ROOSEVELT."

Exhibit No. 13: "Progressives of the north, judging from declarations of Senator Miles Poindexter of Washington, whose leadership is recognized by the Progressives of northern Idaho and the 'Spokesman-Review' of Spokane, are just as much in arms over the decision of the supreme court brought about through the action of the Republican state central committee, as are the people of the southern part of the state.

"Senator Poindexter in an interview in the 'Spokesman-Review' is particularly bitter because of the decision and denounces its injustice in unmeasured terms. Among other things he says:

" 'The decision is an outrage and a flagrant instance, fortunately rare, of the attempted control of politics by the judicial bench. It is as tyrannical as the action of the Taft state committee at Aberdeen and the national committee at Chicago —and worse because it is perpetrated by a court.'

" ' . . . . The bosses have simply rekindled the flame of political revolt. Voters who might have been indolent and forgotten the outrage perpetrated at Chicago will not forget the decree of disfranchisement promulgated at Lewiston.

" 'There will be added zest to the whole Progressive fight in Idaho. A new battle cry has been made by the bosses for their own destruction, and all over the Gem state till November the cry will ring out:

" 'Don't forget Chicago.'

" 'Remember how Paul Clagstone was counted out of the nomination.'

" 'Remember the Lewiston disfranchisement decree.' "

Exhibit No. 14:

"A PERPETUAL POLITICAL MONOPOLY IN IDAHO.

"Perhaps the most repulsive feature of the supreme court's decision prohibiting the printing of the names of the Roosevelt electors upon the ballot, is the fact that in order to reach this decision the court had to rule that there is no way by which presidential electors may be named for any except the existing parties. . . . .

"The supreme court of Idaho, the only one, fortunately, so far in the entire nation to hold and lay down such views, has laid down the law that all the people of Idaho can do is to take their choice between two oligarchies. . . . .

"There are only two peaceful methods open to the people of the state to bring about a change of the terrible situation in which they are placed by the supreme tribunal of the state from which there is no appeal. Both of these lie in an appeal to the intelligence of the people. One is to reorganize and rehabilitate the supreme court as quickly as the laws will permit, and the other is to outwit the shrewd justices of the court, as it is now constituted, by writing in the names of the presidential electors for the formation of a party that offers freedom. . . . . "

Exhibit No. 16: "The more carefully the decision of the supreme court of this state wherein it prevented the printing of the Roosevelt electors upon the ballots for the November election, is studied and the more it is compared with decisions of other state courts and with the decisions of the supreme court of the United States, the more convincing becomes the belief that the decision was purely and solely a political and partisan one made only for the purpose of preventing the supporters of Roosevelt from voting their choice and to drive them to vote for Taft or Wilson, both satisfactory to the cor-- porate and special interests of the state. . . . .

"Our state supreme court is the accommodating one."

Exhibit No. 17: "State Chairman Gipson of the Progressive state committee, takes Chairman Day of the Republican state committee to task. . . . .

" 'Gloating over the apparent success of one of the most outrageous conspiracies known to the political history of Idaho, in which he and E. G. Davis, the secretary of the Republican state central committee were the prime agents, a conspiracy which had for its aim the disfranchisement of a large body of his fellow citizens, and the defeat of Senator Borah, Mr. Day attempts to defend a decision of the supreme court of this state which every honest citizen regrets. . . . .

" 'The people will resent the attack all right, as stated by Mr. Day. The attack they will and do resent is his criminal effort to take from them the sacred right of franchise and not the righteous indignation of Colonel Roosevelt at a decision which is defended and supported in Idaho by no honest or honorable man to-day. . . . . ' "

Exhibit No. 18: "Pretty soon the opposition will give up its efforts to down the Progressives. First they stole the nomination away from them at Chicago, then they counted out their candidate in the primaries, next they ordered their disfranchisement. . . . . "

Exhibits Nos. 15, 19, 21, 24 and 25 are the same as No. 12 inserted above.

Exhibit No. 20:

"A POLITICAL AND PARTISAN DECISION.

" . . . . Is it any wonder we are indignant? Have we not a right to feel indignant and even outraged? The court admits there was no law specifically denying this franchise right. If there had been none of us could have blamed the court for sustaining the law. But the court made a law which we do not believe was in the statute books at all, so that it might rule the ticket off the ballot."

Exhibit No. 23: Paul Clagstone said:

"There are two reasons why I cannot express just how I feel regarding the decision of the supreme court of Idaho in refusing to allow the Roosevelt electors on the official ballot.

"One reason is because of my limited vocabulary, and the second is that I don't desire to be cited for contempt of court.

"But while this decision has been embarrassing to the Progressives of Idaho, it has at the same time aroused such a storm of indignation all over the state that the Progressives are more determined than ever to carry the state for Roosevelt and repudiate the supreme court for this decision.

"The Progressives will try to get the case reopened. Whether they will succeed or not I cannot venture a guess. But the fight will go on just the same. . . . . "

Exhibit No. 28: "Not even the supreme court can disfranchise intelligence."

Exhibit No. 29: "Remember that the supreme court sustained this suit and made it necessary to write in the names of the Roosevelt electors in order to vote your choice."

Exhibit No. 30: "Had not the supreme court of this state enacted a law which enabled that court to prohibit the printing of the names of the Roosevelt electors upon the ballots, Roosevelt would have carried the state. . . . .

"That decision of Idaho's court will go down into history as the worst instance of judicial enactment of law that the country has ever known. . . . .

"The case is one which will never be referred to by other courts as a precedent unless an instance should arise where some other court is seeking an excuse to disfranchise the people of the state when there is no law which authorizes such disfranchisement, but still the next legislature should recall this decision by the enactment of a law so plain that future courts in this state will not dare to place upon it a construction that serve the purposes of a political party seeking victory against the will of the people."

Exhibit No. 31:

"ONLY A PART OF THE STORY IS TOLD. AGREE-
MENT ON SENATORSHIP IS SAID TO BE FAR–
REACHING. RECALLS DECISION BY THE SU-
PREME COURT. CLAIM IS MADE THAT ACTION
OF COURT PAVED THE WAY FOR ELECTION OF
HAINES AND STEWART AND LATER THE NAM-
ING OF AILSHIE AS UNITED STATES SENATOR.

"If there is any credence to be given to the Ailshie-Budge
combine, about which considerable has been said of late, it is
claimed that equal credence should be given to the balance
of the reported combine, so the politicians are saying. Ac-
cording to these politicians and according to the same rumor
which told of the Ailshie-Budge agreement, that agreement
was more far-reaching than the preliminary announcements
would indicate.

"It is even charged that the preliminary announcement
was made after the rumor gained circulation for the very
purpose of heading off publication of the full agreement.
According to the announcement made, the agreement was
merely one whereby Judge Ailshie was to receive support for
United States Senator to succeed the late Weldon B. Heyburn
and after his election Judge Budge of the Fifth Judicial Dis-
trict was to be appointed justice of the supreme court.

"The same rumors which gave that alleged combine
credence, went much further than this. According to the
story, the arrangement was made prior to the filing of the
suit instituted by the Republican state central committee to
prevent the printing of the Roosevelt electors upon the offi-
cial ballot.

"It was the idea at that time that none of the Republican
ticket had any chance for success. It was also the idea of
the Republican state central committee that the Progressive
movement was merely 'a one man' movement. This is a be-
lief frequently expressed by old line Republicans and it was
one held by them all at that time. For that reason, while

they had no hope that the supreme court would dare deliberately to reverse itself, which it would have had to do in order to rule the state ticket off the ballot, that ticket having been nominated in exact accordance with proceedings laid down by the court, they did have the hope that by having the electors ruled off, the whole movement would fail because of being deprived of the prestige and popularity of Roosevelt.

"Accordingly, so the same report goes, that was the foundation for the original story, it was agreed to bring the suit, secure the refusal to permit the names of the presidential electors to be printed, make certain the election of Haines, and, therefore, the ability to fulfill the other part of the arrangement, namely: the election of Ailshie, if possible, and the appointment of Budge to fill the vacancy upon the bench, and the naming of Attorney General McDougall to succeed Budge on the district bench.

"This same report has it that Chief Justice Stewart was vitally interested because of reports that the southeastern voters were supporting Bowen for justice of the supreme court because of dissatisfaction with the success of Stewart in the primaries when he defeated Judge Budge, who carried the southeast by a good majority in the July primary election. The alleged combine involved the support of the entire Republican ticket, according to this story, consequently the election of Judge Stewart would be made certain.

"It is also pointed out by those who have studied the situation, that the decision in the ballot case written by Ailshie himself, also paved the way for an interpretation of a clause in the constitution of the state which has been found twice already to interfere with the political ambitions of Justice Ailshie. . . . .

"That constitutional provision forbids a justice of the supreme court from becoming a candidate for any office of profit or trust 'under the laws of this state.' Those who have studied the ballot decision point out that by holding that such federal positions as presidential electors and congressman were not 'state offices,' the court clearly paved the way to hold that the office of a United States senator does not come

'under the laws of this state,' and that, therefore, Justice Ailshie is now eligible to make the political contest for that office, whereas before the ballot decision was rendered, it would appear that he would be barred.

"Thus, if any credence is to be given to the alleged combine at all, it is claimed the same amount of credence should be given to the entire program which, as reported, involved a decision of the supreme court ruling the Progressive electors from the ticket, an interpretation of the law which would pave the way for the candidacy of Justice Ailshie for United States senator, his ultimate success in that candidacy, the changing of the vote of the southeast, which was going away from Judge Stewart; to him and his consequent election, the election of the entire Republican state ticket, including Haines for governor, to whom would be given the larger power to carry in effect the agreement, the appointment of Judge Budge to the supreme court and the further appointment of Attorney General McDougall to succeed Judge Budge as judge of the fifth judicial district."

Upon the filing of said information, a citation was issued to said defendants, returnable on the 6th day of December, 1912, directing them to show cause, if any they had, why they should not be held in contempt because of the publications of the matters set forth in said information.

On the said 6th day of December, the defendants Sheridan and Broxon appeared and filed a general demurrer to said complaint and the defendant Cruzen filed a verified answer, which, exclusive of the title, is as follows:

"Comes now the defendant A. R. Cruzen, and appearing for himself and answering for himself only the allegations contained in the information filed in this court in the above-entitled action, admits, denies and alleges:

"1.

"The defendant denies that he owns or controls or ever did own or control a large block of the stock of said 'Evening Capital News,' a newspaper published daily at Boise, Ada county, state of Idaho, or that he ever at any time or at all

owned or controlled any of the stocks or bonds of said newspaper or the corporation which owns the same.

## "2.

"And defendant alleges that he is not now and never has been interested financially or otherwise, to any extent, or at all, in the said 'Evening Capital News' or the corporation controlling and owning the same; that he never has loaned or advanced any monies, securities or credit to said 'Evening Capital News,' or the corporation owning the same, and that they or either of. them, are not indebted to him or ever have been in any amount whatsoever.

## "3.

"And this defendant denies that at any of the times alleged in said information, or at all, that he has controlled, commanded or dictated the matter or any of the matter, which has appeared in said newspaper during the last several months, and which is set forth in the said information herein; and defendant denies that in conjunction with the defendant Sheridan and the defendant Broxon, or with any other person or at all, that during the times mentioned in said information or at any other time, that he has controlled the policy of said 'Evening Capital News.'

## "4.

"And this defendant alleges that he has read the matters and facts set forth in said information filed herein, and as to all those articles appearing in said 'Evening Capital News,' this defendant had no knowledge and was not advised that said articles or any of them, would be published in said 'Evening Capital News'; and that this affiant never saw or heard of these articles prior to the time that he read the same in the published edition of the paper wherein said articles appeared; and this defendant denies that with his knowledge or consent or connivance or acquiescence or command, any of the editorials or other matters set forth in the information herein appeared or was published in said 'Evening Capital News' or any other publication.

"That this defendant is not now and never has been an officer, agent or employee of the corporation publishing said 'Evening Capital News,' and has not in any manner been connected with the publication thereof."

The case was thereupon continued until December 9th for argument upon the demurrer of Sheridan and Broxon. On that date said defendants filed an amended demurrer, adding to the original demurrer the further ground that the court had no jurisdiction of the persons or subject matter of the proceedings. Thereupon the demurrer was argued to the court by respective counsel and taken under advisement. Thereafter, on the 10th day of December, the court overruled said demurrer and gave the defendants Sheridan and Broxon until the 20th day of December, 1912, in which to answer.

*In limine,* if the judges of this court, in the discharge of their official duties, could permit themselves to be influenced by personal considerations, they certainly would deplore the occurrence of this case. Should the judges be reduced to the alternative of either submitting tamely to contumely and insult, of resenting it by force, or resorting to the doubtful remedy of an action at law? If such a state of things existed, it would rest in the discretion of every party in court to force the judge either to shrink from his duty or incur the degradation of his authority, which must unavoidably result from the adoption of either of the above alternatives. The judges cannot but feel it a delicate task to define and decide upon the extent of their own powers, nor are they ignorant of the fact that the judgment they are called upon to render in this case may expose them, on the one hand, to the imputation of cowardice, timidity and irresolution, or, on the other hand, to that of usurpation and tyranny. The verity of these imputations or suspicions would not be more unworthy of the judges than the fact of their shrinking from this question because of the consequences in which they themselves might be involved by it. Every occasion of resort to their extraordinary powers should without doubt be carefully avoided by them, but when forced upon them, as in this case, should be met with deliberation and firmness.

With such sentiments and convictions we have entered upon the consideration of this case, conscious that we, as judges, have less at stake than the people, and regardless of consequences which we could not have averted without a dereliction of duty and a degradation of the court.

In presenting the demurrer, counsel for defendants Sheridan and Broxon argued, first, that the information alleged no contempt; second, that the state should have been made the plaintiff in this proceeding; third, that the case concerning which said publications were made, to wit, *the State of Idaho ex rel. Spofford vs. W. L Gifford, as Secretary of State of the State of Idaho,* was not pending before this court at the time said publications were made, fourth, that the court has no jurisdiction of this proceeding.

(1) The first question then is· Does the information allege sufficient facts to show contempt?

It is alleged that said defendants Sheridan, Broxon and Cruzen controlled the policy of said "Evening Capital News" during the time said publications were made; that said articles were intended to influence this court in its decision in said case, and that said editorials and articles tended to bring said supreme court into disrepute and lessen the respect due its authority, and were unwarranted and contemptible, and a contumacious attack upon said court and the judges thereof, and are defamatory and were calculated to impede the administration of justice; that said editorials and other articles were wilful and malicious misrepresentations of the attitude and holding of said court concerning said cause, and wilfully and maliciously misrepresented the position the court took with reference to said cause and matter; and that said articles were intended to distort said decision and were intended and calculated to impede the administration of justice and to defame the court.

In five of said articles the following language appears: "It is impossible to protest too strongly against what is literally the infamy of this decision"; "reactionary conduct of a reactionary court"; "it is an attempt to beat the cause

by trickery and chicanery." And in another article the following language is used: "The decision is an outrage and a flagrant instance, fortunately rare, of the attempted control of politics by the bench. It is as tyrannical as the action of the Taft state committee at Aberdeen and the National Committee at Chicago, and worse because it was perpetrated by a court." In another: "The more convincing becomes the belief that the decision was purely and solely a political and personal one." And again: "Our state supreme court is the accommodating one." Again: "A decision which is defended and supported in Idaho by no honest or honorable man to-day." And referring to said decision, it is said: "The Republican State Central Committee is directly responsible for one of the greatest crimes ever committed against the electoral franchise of the people of the United States." In large headlines is the following: "Only a part of the story is told. Agreement on senatorship is said to be far-reaching. Recalls decision of the supreme court." It is stated in that article that the action of the court paved the way for Haines for governor and Stewart for justice of the supreme court, and later the naming of Ailshie for United States senator. Said article purports to give a rumor to the effect that upon the death of Senator Heyburn an agreement was made whereby Judge Ailshie was to receive sufficient support to elect him United States senator, and that Judge Budge of the fifth judicial district court would be elevated from the district bench to the supreme bench to fill the vacancy caused by the elevation of Judge Ailshie, and that in order to carry this plan to completion, it would be necessary to procure the election of Haines as governor, and in order to satisfy the parties who were in the combination, the Roosevelt electors were eliminated from the ticket by a decision of the supreme court upon a suit filed for that purpose, and that in order to obtain a unanimous decision of the supreme court, it was necessary to take care of Judge Stewart, who was a candidate for re-election, and that if this combination could be carried out by the court on its part by rendering said decision, the southeastern or Mormon counties would support

Judge Stewart and Haines and the entire Republican ticket. The viciousness and absurdity of this statement is made apparent at once when attention is called to the fact that Senator Heyburn's death occurred unexpectedly ten days after the decision of the Spofford case was rendered. The direct charge is there made against the court that it rendered said decision by reason of a political trade or bargain and not on the law and facts. What greater wrong can be charged against a court than that its decision was obtained by a political trade or bargain? Official corruption of the worst kind is there charged. That charge was made recklessly and deliberately, and is a criminal contempt. In effect, it charges the judges with the violation of their official oaths, and the court with being actuated by motives as base as any human mind can conceive.

The charges made in these publications were of an extraordinary character, and, if true, are sufficient to warrant the impeachment of the members of said court. They were intended to degrade the court and bring it into the contempt of the people. They were made for base political purposes, and charge the court with improper and criminal personal and political motives. They require no innuendoes to explain them. Many of them are repeated time and again and emphasized by printing in capital letters, showing the maliciousness of the publishers. They were intended to raise a popular clamor against the court. There was an attempt by wanton defamation and falsehood to insult and intimidate the judges, and degrade the court, and destroy its power and influence, and to inflame and prejudice the people. The maliciousness of the defendants is shown by the fact that they did not publish the decision in the Spofford-Gifford case so that the readers of the "Evening Capital News" might determine for themselves the conclusions reached by the court and the reasons given for those conclusions, but they maliciously and wilfully misrepresented said decision in order to deceive its readers and vilify the court. The liberty of the press is often claimed as a cover by character assassins to gratify ill-will and passion, or to pander to the passion and

prejudice of others.    The liberty of the press, in its true sense, must be upheld, but flagrant abuses of that liberty must be punished.

Judge Freeman, in his note to *Percival v. State,* 50 Am. St. 574, divides contempts of courts by newspapers and similar publications into two classes: First, those in which it is claimed that the object of the publication was to affect the decision of a pending cause; second, those which have for their apparent purpose the bringing of courts, or the judges and other officers constituting an essential part thereof, into discredit.    The articles complained of in this proceeding really come under both those heads, as no doubt the object and purpose of some of those publications was to affect the decision of a pending cause, and some of them were for the purpose of bringing the court into discredit.    It was a direct attack upon the court as a court, and the judges, by prosecuting a civil action for libel or slander, could not protect the honor of the court, and the court could not bring a private action to protect itself, and its only means of protecting its honor is by a contempt proceeding.

It was said in a late case, decided by the supreme court of Georgia, on October 12, 1912 (*In re Fite,* 11 Ga. App. 665, 76 S. E. 397), as follows:

"It is suggested that the proper remedy, where no case is pending and the court is scandalized, is prosecution for criminal libel.    Where a publication which constitutes contempt contains libelous attacks, a prosecution for libel can also be instituted; but the character of a publication as a criminal contempt is separate from its character as a criminal libel.    The one is punished by the court whose judicial integrity is assailed; the other may be prosecuted before a jury for a violation of the criminal statute.    It would be the grossest injustice to compel a judge to leave the bench and assume the role of prosecutor to protect the court from libelous and contemptuous attacks.    Courts are not required to enforce respect through verdicts of juries, but possess the power to punish, as for criminal contempt, libelous publications upon their proceedings, present and past, upon the ground that such publications tend to degrade

the tribunals, destroy public confidence and respect for their judgments, and effectually obstruct the free and impartial cause of justice. . . . . If this court does not defend and protect itself from slanderous charges of the character contained in the article, the individual judges would deserve, and should promptly receive, the contempt of all intelligent and honorable men; for the court which is too weak to demand and enforce decent and respectful treatment cannot expect to secure or retain the respect and confidence of the people.''

Proceedings in contempt were sustained in *Ex parte Baird,* 27 New Brunswick, 99, based upon a publication which charged a judge with having granted, for purely political motives, a writ of prohibition to stay a proceeding to recount votes polled at a recent election.

The liberty of the press is not protected against the publication of deliberate falsehood and misrepresentation in regard to decisions of courts, even though the publishers may think that public or political interests would be served by such falsehood and misrepresentation. The contention that the public good requires the publication of the news of the day, even though such news be malicious falsehood and slander, is without any merit whatever. The public press is not licensed to do evil even under the misapprehension that good may result therefrom. The public press has no more license to publish falsehood and defamation than has a private individual. If there be a sentiment among the people demanding the publication of falsehood and calumny, and charging courts with selling their decisions, it must have been formed very recently from the utterances and publications of yellow journals and muck-raking magazines, and violent and depraved agitators who seek to annul the constitution of the United States and the constitutions of the several states, and who have vilified and undertaken to degrade the courts established by the people themselves. But we do not believe there is a public sentiment in this state that demands that the public press make false charges against the courts in order that good may come therefrom or to promote some contemplated reform. It has been universally recognized that injury would flow from

unbridled tongues and pens, and by conceding to the courts the power to punish contempts against them, generally the people have recognized, since the foundation of our government, the trustworthiness of the judiciary in vindicating by summary process their own authority and dignity, and not a single instance of the abuse of that inherent power has been called to our attention.

In *In re Cheeseman*, 49 N. J. L. 137, 6 Atl. 516, 60 Am. Rep. 596, the court said:

"The importance of the 'liberty of the press' is urged upon us. We do not underestimate it; but after all, the liberty of the press is only the liberty which every man has to utter his sentiments, and can be enjoyed only in subjection to that precept both of law and morals, *Sic utere tuo, ut alienum non laedas.* (So use your own in order that you may not injure another's.) In a government where order is secured, not so much by force as by the respect which citizens entertain for the law and those charged with its administration, nothing which tends to preserve that respect from forfeiture, on the one hand, and detraction, on the other, can be hostile to the commonwealth."

Misrepresentation and falsehood are not justifiable criticism; they are not criticism at all, and the defendants Sheridan and Broxon in this proceeding have attempted in their answer to justify their misrepresentation and falsehood in regard to said decision of this court on the ground of the great public interests involved. But, as before stated, great or any public interest does not demand the malicious defamation and vilification of our courts.

The information states a cause of contempt.

(2) It is next contended by counsel that the state should have been made the plaintiff in this proceeding. That contention is without merit, as this is not a criminal action, but a proceeding to punish summarily for contempt, and the statute does not require that such proceedings be brought in the name of the state. Certain contempts, however, are made crimes by our statute, and are punishable by information or indictment the same as any other crime, and in such an action

the state must be made a plaintiff.  But in a proceeding for contempt, it is not necessary to name the state as plaintiff.  In the punishment of crimes on information and indictment, the defendant is entitled to a jury; but not so in contempt proceedings.

It was held in *In re Debs,* 158 U. S. 594, 15 Sup. Ct. 900, 39 L. ed. 1092, that one accused of contempt is not entitled to a jury trial; and in *In re Fellerman,* 149 Fed. 244, that a contempt proceeding is *sui generis,* and that it may be considered as having the same meaning as a misdemeanor, but it differs from it in this, that it is not indictable but punishable summarily.  No court has ever held that a party is entitled to a trial by jury in a proceeding for contempt.  It must therefore follow that the rules regarding the trial of crimes by information or indictments are not applicable to proceedings for contempt.  We have no statute requiring contempt proceedings to be brought in the name of the state.  In the Chadwick case, 109 Mich. 588, 67 N. W. 1071, the contempt proceeding was entitled *"In re Chadwick."*  In a New Mexico contempt proceeding against *Hughes et al.,* the case was entitled *"In re Hughes et al."* (8 N. M. 225, 43 Pac. 692). This proceeding was begun in the name of and by the attorney general of the state, and was properly brought in that name. There is, therefore, nothing in the contention that the state should have been named as plaintiff.

(3) The third point contended for by counsel for the defendants Sheridan and Broxon was that the publications referred to in the information were made in regard to the decision of the court in the case of the State of Idaho on the relation of Judson Spofford *versus* W. L. Gifford, as Secretary of the State of Idaho, and that said case had been finally determined, and was not pending before the court at the time said publications were made.

The original decision in that case was handed down on the 8th of October, 1912, and the petition for rehearing was filed on the 15th of October, which was considered by the court and denied on the 23d of October, 1912.  The cause was therefore pending until the petition for rehearing was determined, and

the principal publications and articles referred to in said information were published prior to that date.   Those published after and attached to said information simply show the viciousness of the former publications.

At the time the Spofford-Gifford case was decided, the court concluded it would give the usual time for presenting a petition for rehearing.   After the opinion in said case was filed, there was much newspaper talk about a petition for a rehearing, and on the 15th of October, seven days after the rendition of the decision, a petition for rehearing was filed, signed by Harry Kessler, H. E. McElroy, J. J. Plowhead and Ben F. Tweedy, as attorneys for the defendant, which attorneys are members of the bar of this court and in good standing, and their right to present said petition has not been questioned. On said petition for rehearing, the court proceeded in good faith to re-examine the case, and upon reaching a conclusion the rehearing was denied, and there can be no question in this case but that said case was pending until the 23d day of October, 1912, when said petition for rehearing was denied.

It was held in *State v. Tugwell,* 19 Wash. 238, 52 Pac. 1056, 43 L. R. A. 717, that a contemptuous publication made after the rendition of the decision and after the time for rehearing has elapsed is nevertheless in concerning a pending suit if time still remains for application for the modification of the opinion.   However, there are a number of well-considered cases which hold that the power of the court to punish for contempt is not limited to cases pending.   But it is not necessary for us to pass upon that question in this case.   (*In re Chadwick,* 109 Mich. 588, 67 N. W. 1071; *State ex rel. Attorney General v. Hildreth,* 62 Vt. 382, 74 Atl. 71, 137 Am. St. 1022, 18 Ann. Cas. 661, 24 L. R. A., N. S., 551; *State ex rel. Crow v. Shepherd,* 177 Mo. 205, 76 S. W. 79, 99 Am. St. 624; *Burdett v. Commonwealth,* 103 Va. 838, 48 S. E. 878, 106 Am. St. 916, 68 L. R. A. 251; *Commonwealth v. Danbridge,* 2 Va. Cas. 408; *State v. Morrill,* 16 Ark. 384; *In re Fite,* 11 Ga. App. 665, 76 S. E. 397.)   The latter is a very carefully considered case, and is illuminative of several of the questions herein involved.

(4) The fourth contention is that this court has no jurisdiction of this proceeding, counsel contending that since the contempt charged is a criminal constructive contempt and a criminal offense, the proceedings in the prosecution of criminal offenses must be followed, as provided by statute in criminal cases. It was held in *In re Fellerman,* 149 Fed. 244, that a person charged with contempt is not entitled to a jury trial, and that the rules regarding indictments and trial of criminal cases are not applicable to such proceedings. It was held in *State v. Howell,* 80 Conn. 668, 69 Atl. 1057, 125 Am. St. 141, 13 Ann. Cas. 501, that a proceeding for contempt is not a criminal prosecution, though of that nature, and that a court without criminal jurisdiction has jurisdiction to punish for contempt, as such proceedings are for an offense against the court as an organ of public justice and not a proceeding or action against a person for the violation of the criminal law. No respectable authority has ever denied the inherent power of a court of general jurisdiction to punish summarily for contempt.

In *Ex parte Robinson,* 86 U. S. (19 Wall.) 513, 22 L. ed. 205, the supreme court of the United States held that the power to punish for contempts is inherent in all courts, and that its existence is essential to the preservation of order in judicial proceedings and to the administration of justice, and that the moment that courts of the United States were called into existence and vested with jurisdiction over any subject, they became possessed of this inherent power. (*Ex parte Terry,* 128 U. S. 289, 9 Sup. Ct. 77, 32 L. ed. 405; *In re Debs,* 158 U. S. 565, 15 Sup. Ct. 900, 39 L. ed. 1092.)

It was held in *State v. Howell, supra,* that the power to punish contempts is inherent in courts of record to enable them to preserve their own dignity and duly administer justice. (*In re Woolley,* 11 Bush (Ky.), 95; *Cooper v. People,* 13 Colo. 337, 22 Pac. 790, 6 L. R. A. 430; *In re Chadwick, supra.*)

Numerous cases are cited in the latter opinion holding that the power to punish for contempts is inherent in all courts of record. (*People v. News-Times Pub. Co.,* 35 Colo. 253, 84 Pac. 912; *State v. Woodfin,* 27 N. C. (5 Ired.) 199, 42 Am. Dec.

161.)    In *State v. Morrill*, 16 Ark. 384, the court held that the power to punish for contempt was inherent in courts of justice as a necessary incident to the exercise of the powers conferred upon them.    (*In re Perkins*, 100 Fed. 950; *State ex rel. Attorney General v. Circuit Court*, 97 Wis. 1, 72 N. W. 193, 65 Am. St. 90, 38 L. R. A. 554.)

In *Re Woolley*, 11 Bush (Ky.), 95, the court held that the inherent right in the courts to punish for contempt was not derived from the legislature, and that such power could not be made to depend upon the will of the legislature.    In *Hale v. State*, 55 Ohio St. 210, 45 N. E. 199, 60 Am. St. 691, 36 L. R. A. 254, the court held that the legislature was without authority to abridge the power of a court created by the constitution to punish contempts summarily, such power being inherent and necessary to the exercise of judicial functions.

The legislature has not the authority to restrict the inherent power of the court to punish for contempts, for if it has the power to restrict such right, where will the line be drawn? If it could abridge the right, it could so minimize it as to make it ineffective for any purpose.

In matters of contempt a jury is not required to try the matter under that provision of the constitution providing for "due process of law."    (*Interstate Commerce Com. v. Brimson*, 154 U. S. 447, 14 Sup. Ct. 1125, 38 L. ed. 1047; *Eilenbecker v. District Court*, 134 U. S. 30, 10 Sup. Ct. 424, 33 L. ed. 801.)    In the latter case it was held that the power to punish for contempt was inherent in the courts without the necessity of calling upon a jury to assist the court in the exercise of this power.    In *In re Fellerman*, 149 Fed. 244, the court held that a person charged with contempt was not entitled to a jury trial, and that the rules regarding indictments were not applicable to such proceedings.

In regard to punishment of contempts by courts under the statutes of this state: Sec. 5155 provides that certain acts or omissions in respect to a court of justice, or proceedings therein, are contempts of the authority of the court, and then proceeds to define twelve different acts or omissions.    Said

section does not declare that the contempts therein mentioned are misdemeanors or other crimes.

Sec. 5164 provides that if anyone is guilty of the contempts therein defined, a fine may be imposed upon him not exceeding $500, or he may be imprisoned not exceeding five days, or both.

Sec. 5168, Rev. Codes, is as follows: "The judgment and orders of the court or judge made in cases of contempt are final and conclusive."

Sec. 6305, Rev. Codes, is as follows: "This [Penal] Code does not affect any power conferred by law upon any public body, tribunal or officer, to impose or inflict punishment for a contempt."

Sec. 6529, Rev. Codes, provides that every person guilty of any contempt of court of any one of the kinds mentioned in said section is guilty of a misdemeanor, and then proceeds and describes seven different acts of contempt.

Sec. 7231, Rev. Codes, is as follows: "A criminal act is not the less punishable as a crime because it is also declared to be punishable as a contempt."

Under the foregoing provisions of our statute, judgments and orders in contempt proceedings are made final and conclusive, and certain contempts may be punished as a misdemeanor and also as a contempt. It is also provided that certain contempts are misdemeanors, and also that a criminal act is not the less punishable as a crime because it is punishable as a contempt. The statute in no manner interferes or could interfere with the inherent power of the court to punish for contempt.

As appears by the authorities heretofore cited, the inherent power of the court to punish for contempt cannot be interfered with or abridged by the legislature, at least so far as courts of record are concerned. While the legislature may prescribe any reasonable proceedings to be followed in contempt prosecutions, it has failed to do so, and under the provisions of our statute, when proceedings are not provided by the legislature, any suitable process or mode of proceeding

may be adopted which may appear most conformable to the spirit of the code.    (See sec. 3925, Rev. Codes.)

The reason for the strict rule in regard to contempt cases is obvious to any earnest student of our republican institutions. The language used in the editorials and articles attached to the information has the effect of destroying, in a measure at least, public confidence in the highest judicial tribunal of the state, thus impairing respect for the authority of the court.    If any considerable portion of the people is led to believe that the highest court of the state is guilty of selling its opinions and decisions, and that they cannot rely upon the courts to administer justice, the result may be mob violence with all its detestable features.

Any tribunal that cannot tolerate criticism of its decisions is justly entitled to contempt; but, on the other hand, little respect is due a court that will hesitate to check or discipline those who vilify and maliciously misrepresent it with the object and purpose of degrading it and bringing it into contempt.    The court is charged by said articles with depriving the people of the right to vote in violation of law.    Is it possible to stab the court more fatally than charging that by its decision it has in violation of law deprived the people of the right to vote?    I think not.    No court objects to having its decisions honestly criticised either as to the law or facts, but it is not criticism to impute base motives and dishonesty to the court in rendering its decisions.    Show by fair criticism that a decision is contrary to the law or facts and no court would object to such criticism.    The freest criticism of all decisions of the court is allowed and invited, but criticism ceases and contempt begins when malicious slander, vilification and defamation bring the courts and the administration of the law into dishonor and disrepute among the people.

In *In re Breen,* 30 Nev. 164, 93 Pac. 997, 17 L. R. A., N. S., 572, the court correctly held that one may criticise the opinion of the court, take issue with it in its conclusions of law and question its conception of the facts, so long as his criticisms are made in good faith and in ordinarily respectful language, and when not designed to wilfully or maliciously misrepre-

sent the position of the court, or tend to bring it into disrepute, or lessen the respect due the authority to which a court is entitled.

Assailing the constitution as antiquated, holding the laws in contempt and vilifying the courts through the yellow journals of the country, have encouraged criminals in their criminal acts, and the result has been an unprecedented wave of crime over our country. More than a hundred criminal cases of dynamiting, the destruction of vast amounts of property and the murder of scores of innocent persons have been the result of those criminal acts. And the criminals have received great encouragement from the scurrilous, villainous and criminal publications of such journals. Courts have been almost powerless in the matter because of the corruption and intimidation practiced by such criminals and journals on the people and juries. For much of this criminal work the muck-raking and yellow journals are largely responsible, and the result has been that but very few of the criminals have been convicted. The tide, however, seems to be turning. Two dynamiters pled guilty, and a jury has recently found thirty-eight more guilty. If the public press can do those things with impunity, the average citizen or juryman cannot be expected to hold the courts or the law in very high respect, and enforce or feel much inclination to enforce the law as jurymen.

If the time has arrived in this country when the courts may be vilified, abused, unjustly and without any foundation in truth, and are deprived of the right to punish for contempt, the plan adopted by the founders of our government to have a co-ordinate branch of the government in the judiciary had as well be abandoned and let every man be a law unto himself and let anarchy and "mobocracy" reign.

The demurrer to the complaint must be overruled, and it is so ordered.

On the 20th of December, 1912, the defendants Sheridan and Broxon filed the following answer:

"Comes now the defendants, R. S. Sheridan and C. O. Broxon, deny, admit and allege as follows:

"1. Admit all the allegations of paragraph one of the information.

"2. Admit all the allegations of paragraph two of the information.

"3. Admit paragraph three of the information, except as to defendant Cruzen.

"4. Admit paragraph four of the information, except as to defendant Cruzen.

"5. Deny the whole of paragraph five of the information.

"6. Admit that shortly before the filing of the case mentioned and described in paragraph two of the information and complaint, to wit: On September 29, 1912, there appeared and was published in said 'Evening Capital News,' by command of the defendants herein and with their knowledge, consent, connivance, acquiescence and command, an editorial, a copy of which is annexed to the complaint and made a part of same, and marked 'Exhibit 1.' Deny that the said editorial was intended to influence the supreme court in its decision in said case which the defendants herein believed was shortly to be filed and the said editorial above described in any way tended to bring the above-described supreme court of the state of Idaho or the judges thereof into disrepute and lessen the respect to the authority to which the said court is entitled or that the said editorial was or is an unwarranted and contemptible or a contumacious attack upon said supreme court or the judges thereof, or that it was defamatory or calculated to impede the administration of justice.

"7. Deny that while the said case described in paragraph two of plaintiff's information or complaint herein was pending in said supreme court, there appeared in said 'Evening Capital News' by command of the defendants herein and each of them, or with their knowledge, consent, connivance and acquiescence, certain other and further editorials, articles and items, copies of which are annexed to the complaint and made a part thereof and marked Exhibits Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24, and deny that the said last above described articles, items and editorials and each of them intended to bring the above de-

scribed supreme court of the state of Idaho or the judges thereof into disrepute and lessen the respect due the authority which said court is entitled, or that said articles, items and editorials were or are unwarranted, contemptible, or defamatory, or a contumacious attack upon the supreme court or the judges thereof.

"8. Admit that between October 28 and November 18, 1912, there appeared in said 'Evening Capital News,' by command of the defendants and with their knowledge, consent, connivance and acquiescence and command, certain other and further articles, editorials and items concerning said case, copies of which articles, editorials and items, are annexed to the complaint and made a part thereof and marked Exhibits 25, 26, 27, 28, 29, 30 and 31; and deny that the last above described articles, editorials and items and each of them tended to bring the above-described supreme court of the state of Idaho and the judges thereof into disrepute and lessen the respect due the authority to which the said court is entitled, and deny that said articles, editorials and items were or are unwarranted, contemptible and defamatory, or a contumacious attack upon said supreme court or the judges thereof.

"9. Deny that said above-described articles, editorials and items were or are wilful and malicious, or that all and each of them is a wilful or malicious misrepresentation of the attitude and holding of said court concerning said cause, or wilfully or maliciously misrepresented the position of the court with reference to said cause and matter, or that said articles, items and editorials or each of them, was intended to or did distort the decision of said court in said matter or were calculated to impede the administration of justice.

"For a further and separate and affirmative defense to the information or complaint so called, defendants R. S. Sheridan and C. O. Broxon allege as follows:

"That the said articles were written, printed and published in the honest and sincere belief and conviction that they were matters upon which the public had a right to be informed, to consider and discuss, because of their great public importance and the matter to which they referred was not a

matter involving the administration of justice or jurisprudence so much as the construction of the statute by the court in a special proceeding relating to political matters, in which the whole community was interested, and it was not a matter primarily of the rights of any parties litigant, but was a proceeding which affected the public as a whole, and that the articles and editorials referred to in said complaint were directed wholly to the decision in said case, and its effect upon the voters thereby affected, and were written with the sole intention and purpose of arousing the voters of the Progressive party in Idaho to what the result of said decision would be in the event they did not fully comprehend its significance, and to urge the voters to avoid the effect of the decision by writing in the names of the presidential electors of the said Progressive party on the blanks left on the ticket of said Progressive party. There was no intention to impede the administration of justice, nor could this have been accomplished, for the reason that the decision had already been rendered by the court, and for the further reason that had the decision been in favor of the Progressive party and had permitted the printing of the names upon its ballot, no injustice would have been done to any voter of no matter what political faith in the state of Idaho.

"The defendants aver that they had no intention of publishing any matters concerning said cause while said cause was pending; that they were not apprised that a motion for a rehearing had been filed in said case until several days after the application had been made, and that as soon as they learned of such application for rehearing, they immediately desisted from publishing any editorial comments on the matter until after the said motion for rehearing had been denied by the court; that defendants believed and therefore allege that said motion for a rehearing filed on the 15th day of October, 1912, was a nullity, and that the court had no jurisdiction of the same, for the reason that said rehearing was not applied for nor the motion therein filed by any party to the original action or the attorneys thereof, but by one who was a total stranger to the suit, by one B. F. Tweedy of Lewiston,

Idaho; that the said Tweedy does not appear from the records of the court to have been entered of record, as an attorney in the case, nor does it appear that there was any hearing had upon said motion for a rehearing, but, on the contrary, the defendants aver that there was not time sufficient elapsing between the decision of the court upon the original hearing and the time of the filing of the rehearing to have given the court any power to stop the effect of its mandate to the secretary of state, directing him not to certify to the auditors of the different counties, the electors and congressman as named on the Progressive ticket, nor did this court recall its said mandate pending such pretended rehearing, but, on the contrary, that after the handing down of the decision of the court upon the original hearing, to wit: on October 9th, 1912, the secretary of state immediately acted upon the said mandate of the court and certified the ballots to the different auditors of the respective counties of the state in obedience to the said mandate. That the defendants believed and therefore allege that the different auditors of the different counties, immediately upon receipt of the certified ballots from the secretary of state, placed the same in the hands of the printers in their respective counties, by reason of the fact that the certified copy of the ballot for Ada county was received by the county auditor on October 11, 1912, and was placed immediately thereafter in the hands of the printer, with instructions that the ballot must be in the hands of the auditor at least a week before the day of the election.

"That the said ballot for printing was received for Boise county in the hands of the printer on October 12th; Adams county on October 14th, and in the other counties of the state from that time on, these being the closest counties to the state capital.

"That even in the event that the petition on motion for rehearing had been allowed on October 23, 1912, the date the said hearing was denied, it would have been too late to have profited the voters who wished to vote for the Progressive party presidential electors and congressman anything, and that the court had no power to stop the election by the rehear-

ing of a case and the withholding of the order to the secretary of state as to the form the ballot should take or as to what it should contain, and that the court did not withhold such order, but that the order and mandate of this court was fully obeyed and complied with prior to said date, and was wholly beyond recall by rehearing or otherwise and the pretended rehearing was a nullity. That the defendants believed that upon the issuing of the mandate of the court, because of the short time intervening before the election was to be held and the action of the secretary of state, who acted upon advice by wire from Lewiston, Idaho, where the court was then in session, that the court, itself, and the secretary of state, considered the mandate final and acted thereunder without waiting for the time provided by the rules of the supreme court, to wit, twenty days in which a rehearing might be applied for; and that it would have been a physical and mechanical impossibility to prepare for and hold an election upon the day provided by law, if the court should hand down a decision on the 8th of October in which a right of twenty days was open for the filing of a petition for rehearing which would bring the matter, if the petition were heard the same day as filed, if filed upon the last date, to wit, the 28th of October, and allowing fourteen days for the publication of the nominations as required by act of the legislature passed at the tenth session, and approved March 11, 1909, which would have necessitated the publication of the nominations running to the 9th day of November, or, in other words, the publication would not be complete until four days after the election had been held.

"It is further set forth that the court having handed down its decision on October 8, 1912, a rehearing having been filed on the 15th of October and the rehearing denied on the 23d of October, the secretary of state, had he waited to obtain the mandate of the court until the said 23d day of October, would have been given but nine days in which to certify the ballots to the auditors of the respective counties to place the said ballots in the hands of the printers, and to distribute them to the respective precincts in their counties, which would have been another physical and mechanical impossibility.

"The court could not by any possibility have recalled the action of the secretary of state in certifying the ballots to the county auditors immediately upon receiving the wire from the court at Lewiston, Idaho, informing him that the mandate had been issued, because that would have had the effect of depriving the voters of the state of Idaho from voting at all on the 5th day of November, 1912, which power the court could not exercise. The defendants, therefore, believed that there was no cause pending after the mandate had been issued by the court on the 8th day of October, 1912, and any rehearing thereon would have been a work of supererogation.

"Defendants aver that the articles published in their paper were published with the honest belief of their right to do so under the constitution of the United States and the state of Idaho, that is, the right of free speech, which has been universally exercised by the newspapers of the United States from the time of the adoption of the constitution, in reference to matters which have been finally adjudicated in the courts, and noticeably in the case at bar, not only by the papers outside the state but by those within the state of Idaho.

"Defendants aver that they believed in good faith that it was their duty and that they had a right to express their honest criticism of the conclusions of the court, and to publish the views of men prominent in the state and nation for the information and consideration of the readers of the newspaper that they published, and that in said belief they had a wide precedent by reason of the decisions of a large number of the learned courts of the United States, the precedent of the great newspapers of the country and the comments of men highest in the political history of these United States.

"Defendants aver that they had no intention whatever of impeding the administration of justice. That said articles were not directed toward the court as a judicial body acting upon a proceeding incident to the administration and enforcement of the law, but were directed to the advisability and results of the decision in the political matter affecting a large number of people within the state, and they stand upon their honest belief that they were acting for the best interest of

such people, for whom they were striving to obtain that to which the defendants earnestly believed they were entitled.

"Wherefore the defendants R. S. Sheridan and C. O. Broxon pray that they may be hence dismissed without day."

To the above answer a general demurrer was filed by the attorney general, which was sustained by the court for the following reasons:

The answer of defendants Sheridan and Broxon admits that the allegations in the information found in paragraphs 1, 2, 3, 4 and 6 are true, and that the articles were published "by command of the defendants and with their knowledge, consent, connivance, acquiescence and command."

The denial that such editorials and articles were intended to influence the supreme court, or tended to bring the supreme court into disrepute, etc., or that defendants had any contemptuous intention in publishing the same is no defense to the allegations of the information. The intent is immaterial, because the articles themselves, as the court has previously held by its ruling upon the demurrer to the information, are contemptuous. That being true, the intent of the defendants in publishing them would be no defense whatever.

The denial in the 7th paragraph of the answer is to the effect that the articles and editorials contained in the information were not published during the pendency of the Spofford-Gifford case. The court, by ruling upon the demurrer to the information, has held that that cause was pending at the time such publications were made, excepting those published after the 23d of October, the date the petition for a rehearing was denied.

Paragraph 8 of the answer admits the publication of certain articles between the 28th of October and the 18th of November, but denies that such editorials and articles were intended to bring the supreme court or the judges thereof into disrepute and lessen the respect due said court, or that they were unwarranted or contemptible. The information was not based on those publications, yet when taken in connection with the articles published during the pendency of said suit, they are material, in that they show the malice and evil intention

of the publishers. Therefore said denials do not constitute a defense to the charge of contempt.

The denial in paragraph 9 of the answer, to the effect that said articles and editorials wilfully and maliciously misrepresented the position of the court with reference to said cause, or that said articles and editorials were intended to or did distort the decision of said court, or were calculated to impede the administration of justice, constitutes no defense, for the reason that it is merely a denial of the contemptuous intent and purpose of the publishers in publishing such articles. The intent with which a contemptuous article is published is no defense in a contempt proceeding. Such matter, however, may be taken into consideration by the court in determining the penalty to be imposed by the court in mitigation of the punishment.

One of the separate and affirmative defenses set forth in the answer is to the effect that the decision of the court in the Spofford-Gifford case related to political matters in which the public as a whole was interested. The supposed interest of the people in a political or other matter would not justify the publication of contemptuous articles, and for that reason said matters therein alleged are not a defense to this proceeding.

Averments in the answer to the effect that said articles were published with the honest belief that the publishers had the right under the constitution of the United States, as well as under the constitution of the state of Idaho, to freely publish anything they desired in reference to matters which have been finally adjudicated by the courts, which right, it is averred, has been universally exercised by the newspapers of the United States from the time of the adoption of the constitution, state no defense to this proceeding, as the information does not charge contempt by reason of the fact that publications were made containing certain matters in regard to a suit already decided, but that such publications were contemptuous, and in fact were made in regard to a case then pending. The information does not challenge or interfere with the right to publish, but seeks to hold the publishers re-

sponsible for the abuse of that liberty as provided by art. 1, sec. 9, of the state constitution, which section is as follows: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty," and was not intended as a house of refuge for malicious slanderers and libelers. This court will uphold the liberty of the press in publishing whatever it may desire to publish, but the flagrant abuse of that liberty will be punished. The liberty of the press as provided for by the constitution does not license unrestrained scandal and wanton defamation of the courts.

The demurrer to the answer having been sustained, and said defendants Sheridan and Broxon declining to answer further, the cause was set for trial on December 23d, 1912, at which date the cause came on for hearing, in regard to the defendant Cruzen upon his answer heretofore set forth. The attorney general, to establish the allegations of the information, introduced the said information with the exhibits attached thereto and a stipulation of facts which had been entered into by the attorney for Cruzen and the attorney general, which stipulation of facts is as follows:

It is hereby stipulated by and between counsel for the respective parties hereto that the witnesses on behalf of the plaintiff now subpoenaed would, if sworn, and called as witnesses, testify to the following statement of facts:

1. That on the 28th day of January, 1910, the Capital News Publishing Co. issued a chattel mortgage to the Boise Title and Trust Company in trust to secure the payment of sixty bonds of said publishing company for $1,000 each.

2. That one Timothy Regan held at one time a block of said bonds.

3. That afterward Governor Brady had control of a block of said bonds, or guaranteed the interest thereon, which was held by him up until the summer of 1911.

4. That the defendant Cruzen has made statements to various persons that he had purchased and owned the interest formerly owned by Governor Brady.

5. That in February, 1912, defendant Cruzen stated and declared that he owned the control of said paper, and partic-

ularly that he had control of the political policies thereof. That he made this statement to persons interested in the commission form of government campaign in Boise, and he outlined the policy that the ''Capital News'' would pursue in that election, and that the paper pursued that policy.

6. That during the local option campaign in Ada county, in June, 1912, defendant Cruzen called on the committee in charge of the wet side, and told them that he was in control of the ''Capital News,'' and if they would adopt a certain platform and policy, his paper would support the wet side in that campaign. That the committee adopted the platform and policy as suggested by him, and that defendant Cruzen had articles written and prepared upon the issue in that campaign, which articles were signed by parties procured by the committee and were afterward published in said paper, and that the paper followed the policy outlined by Cruzen, and did support the wet side in the campaign.

7. That defendant Cruzen asked the same committee to interview a number of business men who had withdrawn their advertisements from the said paper, and asked them to again patronize the same, and stated to them as a reason therefor that he now was running the business, and that such actions would be an assistance to him in his business.

8. That after the said election, defendant stated to various citizens that if it had not been for the position taken by *his* paper that the county would have gone dry.

9. That at the Lewiston convention held in ————, 1912, Cruzen stated to a number of people that he was in control of the political policies of the ''Capital News.''

10. That during the primary campaign ending July, 1912, defendant Cruzen told to a number of candidates and other persons that he controlled the political policies of the paper, and that it would only support such persons as he recommended, and that nothing of a political nature or of their candidacy would be published in the paper during the campaign that was not countenanced and approved by him.

That he conversed freely with candidates about the action of the paper with reference to their candidacy, and to cer-

tain ones stated that the attacks that the paper had been making upon them would cease, and thereafter such attacks did cease.

11. That after the November election he stated to citizens of the southeastern part of the state that the voters of that section had not kept faith with him, and had not followed the policy urged and supported by his paper, and that the paper was going to roast them for it, and that the paper did contain articles criticising the action of the voters in the southeastern part of the state.

12. That defendant Cruzen stated to a large number of politicians and citizens in the Owyhee Hotel all during the campaign that he controlled the said paper, and held himself out generally as being the man behind the throne, and made statements that he was running a paper and conducting the business for the purpose of making money, and that when he could no longer make money, that then he would cease to be in the business.

13. That frequently the defendant Cruzen, during the various campaigns above referred to, visited the editorial rooms of the "Capital News" and discussed the campaign and its progress with defendants Sheridan and Broxon, and defendants Sheridan and Broxon for the same purpose frequently called upon defendant Cruzen in his office.

Thereupon the attorney general rested, and thereafter C. O. Broxon was sworn and testified on the part of defendant Cruzen, in substance as follows: That he was the managing editor of the "Evening Capital News" and held that position during the months of October and November, 1912; that he controlled and dictated the policy of that paper; that he had read the information charging the three defendants with being responsible for the publication of the articles referred to in the information, that the defendant Cruzen had nothing to do with controlling or dictating the policy of said newspaper; that it was the business and duty of witness to look over the editorials and matter appearing in said paper prior to their publication; that the defendant Cruzen had nothing to do with it, and that Cruzen had not, *to the knowledge of the wit-*

*ness,* counseled or advised or aided or abetted any person in writing the editorials or articles attached to the information; that the relation of Cruzen and witness was very friendly; that they were working together in politics; that he did not know that they had ever talked about the policy of the paper, but did talk about the policy of the action they would take in relation to politics but did not agree in that. On cross-examination the following questions were asked: "Q. You say, Mr. Broxon, that you are entirely responsible for the publication of those articles? A. In what respect, Mr. McDougall? As far as their authority was concerned and their being sent to the press and publication, I am responsible, yes. I don't own the paper. Q. Do you own any interest in the paper? A. No. Q. You don't control the policy of the paper? A. I always have. I will say in connection with that, I have worked, so far as I know, in absolute harmony with Mr. Sheridan, but the question of whether I could or could not do certain things has never come up between us; I have been allowed to have—proceed as I saw fit, generally; I have consulted with him, certainly. Q. Upon the beginning of a campaign, particularly of this campaign, was the question of the position the paper would take on public questions discussed with Mr. Sheridan before the paper took its position? A. Sometimes; sometimes not. Q. In case you and Mr. Sheridan had disagreed, who would have directed the policy, you or he? A. Such a case never arose. Q. You say you never talked with Mr. Cruzen anything about these articles set forth in this information? A. I said before they were published. Q. Did you discuss with him any other articles that appeared in the paper last year before they were published? A. No, not to my recollection. Q. You say that none of these articles set forth in this information—that you never discussed them with Mr. Cruzen before publication? A. I don't think I did any of them at all. Q. Didn't you show him the first one of the articles set forth here and have him examine it before it was published? A. I have no recollection of it; if I did, it was just merely as I might anyone else. Not for his approval or disapproval, or anything else.

The reason I hesitated here was because I have done the same thing with numerous persons. I have no recollection of it in this case. Q. During the campaign, Mr. Broxon, how frequently was Mr. Cruzen in the office? A. I couldn't tell you that; very frequently. Q. You frequently went up to his office, also, did you? A. No, I don't think I went there very frequently. Q. When he was there, did you and he discuss the political questions of the day? A. Yes. Q. Did you discuss any of the publications that had appeared in your paper? A. Sometimes. Q. Did you discuss any of these questions—any of these articles that are the basis of this proceeding, after they had been published? A. Not to my recollection. Q. You were both of you quite interested in the campaign? A. I was. Q. Wasn't he? Didn't he so express himself? A. Yes, I suppose. Q. Didn't you discuss with him the Roosevelt telegram that appears in this information? A. No. Q. Did you ever hear him—do you say at no time after that was published there was any conversation between you upon that telegram? A. I couldn't say that; I don't know; I probably talked with a number of people; I might have talked with Mr. Cruzen somewhat. Q. Did he ever disapprove of any of the articles in your paper during the campaign? A. Disapprove in what respect? To say they ought not be printed or to argue or the policy or— Q. Yes, either way. A. Yes, he has doubted the advisability of some of the things I have said. Q. Did he ever disapprove of any of·these thirty-one articles that were published? A. I don't know; I wouldn't have paid any attention if he had. Q. Don't you know whether he did or not? A. No, I don't know. Q. You know he didn't approve of a number of them? A. ·Before they were written? Q. Or afterward? A. No, I couldn't say that; I don't know. Q. As a matter of fact, he was there during the campaign very frequently while the articles were written, Mr. Broxon? A. Yes, so were numerous other people; I can't distinguish, General, between what Mr. Cruzen said and others said. Q. He neither approved nor disapproved or commented at all on any of these articles which are the subject

of this proceeding? A. I wouldn't put it so broadly as that; I should say I have no recollection if he did.''

W. H. Thompson was produced as a witness on behalf of defendant Cruzen and testified that he was present in Cruzen's office when Mr. Cruzen requested Broxon to come to his office. In a few minutes after the call, Broxon arrived and a conversation took place between them in regard to the ''Capital News'' supporting Charles Storey as a candidate for the legislature from Ada county. It appears that the ''Capital News'' had been against Storey's candidacy, and the conversation between Cruzen and Broxon was in regard to the fight that the ''Capital News'' was making on Storey, and the witness testified that Cruzen was not successful in that matter, but the evidence shows that from the time that conversation occurred the ''Capital News'' had nothing further to say against Storey's candidacy until the last issue of the paper before the primary election, and did not oppose him after he was nominated.

Cruzen was called as a witness on his own behalf. Many of his answers were incoherent. He denied that he had control of or dictated the policy of the ''Evening Capital News''; that he never saw any of said articles attached to the information before they were published; did not own any of the stock or bonds of the ''Capital News''; was not financially interested in that paper; had made a loan of $2,500 to it, which loan had been paid back; that he was not in Boise in the month of February, 1912; that he was active in the local option campaign and was trying to get Sheridan and the ''Capital News'' on his side of the question; that that campaign was in Ada county in May and June, 1912; that he made the statement to a committee in charge of the wet side in that campaign that he was in control of the ''Capital News''; that during that campaign he might have made ''any old statement''; that Sheridan finally agreed that the ''Capital News'' would support the wets in that campaign, but that he said he would lose business by it and would have to have his loss made up, and that he (Cruzen) tried to procure some advertising for that paper. ''Q. Did you make that state-

ment—that if it hadn't been for the position taken by your paper the county would have gone dry? A. I don't remember anything about it. All summer—we first started out in the fight in the spring; the 'Statesman' kept saying I owned and controlled the paper, and kept it up and kept it up until people would just say I would and I did—and put it up to me and put it up to me, there was no defense to it. . . . . Going to make me own it; everybody was jumping on me for what was said in the newspaper. I got thoroughly disgusted and I didn't care a cuss—excuse me—whether I did own it. I got worn out about it. Q. There were a number of claims as to statements you made to persons that you were in control of the political policies of the 'Capital News'; is that probably true that you made that statement a number of times? A. If they jumped on to me hard enough, I probably did. Q. What is your belief, that you did or did not? A. It would be about like this: If a fellow come up to me, kicking at me about it, I might do it. On the other hand, they had said it so much, about what I had done, if I could get any political pull—I would claim the earth in politics. Q. You won't deny these allegations these witnesses make? A. No, I don't deny them."

On cross-examination he testified that he took an interest in doing what he (Sheridan) wanted him to do in order to have Sheridan help in the campaign; was friendly with the "Capital News"; that in helping to get advertising, he was helping for what he was getting from it; was always very friendly with Sheridan. "Q. Have you done anything, Mr. Cruzen, toward increasing the subscriptions of the 'Capital News' since the time you mention? A. I haven't done anything myself. Q. Do you remember stating to some gentlemen that you had doubled the subscription in Fremont and Nez Perce counties? A. I don't remember about that: I remember Sheridan used to speak to me. I said how was the circulation going on. He said, 'Increasing like everything.' Q. Have you discussed this matter of the ownership and control of the 'Capital News' during the last year with these

gentlemen? [referring to some twenty-odd witnesses who had been subpoenaed on behalf of the prosecution]. A. Oh, anything might have been said in this fight. Q. In the conversation you had with these gentlemen, you stated in reply to Mr. Fraser's question that you might have told them anything and probably did make these statements set out in this stipulation? A. I don't remember those specific things. I don't know, though, if it come up in the right way, I would be in the state of mind to make some of them. Q. You don't deny, though, that you made statements to a number of them that you controlled the political policy of this paper, do you, Mr. Cruzen? A. I might have done it. Q. Well, didn't you? Don't you know you did it? A. No, I don't know that part of it. Q. Isn't it a fact that you held yourself out to the public as being the man in control of that paper all during this campaign? A. As I said awhile ago, I have been twitted so much—twitted about everything I made up my mind, what was the use, let her go. If they wanted to have it that way—let them have it. I didn't deny— Q. If you did state this to these people, was it to draw local support? A. I will tell you what I was doing—if I did that, and I did some time; I was in politics, and of course—I talk like I have been going through Sunday-school—I was in politics and pulled everything I could pull for the side I was for. I used everything I could, like everybody,—claiming everything; like the candidates claiming they were going to be elected; I claimed everything and wasn't getting anything. Q. If you did state to any of these gentlemen contained in this agreement of facts that you controlled the 'Capital News' and was running it for what there was in it for you, then you were telling them what wasn't true? A. It was a political stunt. Q. What? A. A political stunt. Q. What do you mean by a political stunt? A. Well, I was just getting all the water on my wheel I could on my side. Q. Will you explain what you mean by getting water on your wheel? A. I wanted to get all the votes I could for the crowd I was for. Q. If you made that statement, was it true or false?

A.  It was a political statement.  Q.  You won't say on oath it wasn't true, when you made that statement?  A.  Of course, I realize how this is, as I say; of course—you know with politics, if you tell everything you know, you would be in a weak position; you might put it down I didn't tell the truth.  Q.  If you made the statement, was it true or false?  A.  Why, it wasn't true; it was just politics.  Q.  Did you go to their office ('Capital News') frequently during the campaign?  A.  Well, not unusually frequent.  I don't know what you call frequent.  Q.  How often did you go there?  A.  I would likely drop in there twice a week.  Q.  Did you go into the editorial room?  A.  No, I never was back in there but two or three times; hardly ever back there.  Q. You sent for Mr. Sheridan to come over to your office?  A. He may have come over there a few times—not many times.  Q.  Ever telephone for him to come over?  A.  Oh, yes; I have had things—I have telephoned for him to come over.  Q.  Ever telephone for Mr. Broxon and have him come over?  A.  Two or three times, I remember telephoning Mr. Broxon.  I know it has been two or three times.  Q.  Which one of these defendants did you discuss these political matters over with, Mr. Sheridan or Broxon?  A.  I always talked more with Mr. Sheridan; never talked much with Mr. Broxon.  Q.  You know that Broxon controlled the paper, didn't you, the political—the policy of it?  A.  I never—I always thought until recently that Mr. Sheridan paid more attention to the editorial part than he did.  I never knew he didn't.  Q.  You know now though that Mr. Broxon—  A.  He swore so right here to-day.  Q.  All the time that you have been having relations with the 'Capital News,' you have been going to Sheridan?  A.  I talked more to him; I looked upon him as the proprietor.  Q.  Were you particularly friendly—if you made any of these promises or statements, Mr. Cruzen, did you expect at the time you made them that you could procure the 'Capital News' to take the policy you had discussed?  A.  I was very friendly with Mr. Sheridan.  Sometimes I could get him to do things I talked over with him, other times

I could not. Q. Were you particularly friendly with him?
A. I was just like a lot of other fellows—it would be about
the same way. Q. How was your friendship with Mr.
Broxon? A. We never come in contact, hardly ever. Q.
How long have you been close friends with Mr. Sheridan?
A. Known him for a long while. We never got so close
together until we got in that fight this spring—the Roosevelt
fight in this country. Q. Since that time you have been
better friends than you were before? A. We only had one
instance up to—very close friends except in one or two in-
stances up to the Chicago convention. We had an instance
or two in there where I wanted him to do some things; he
wouldn't do it. It grieved me very much.''

The witness also testified on redirect examination that his
relations with Sheridan and Broxon were friendly. ''Q.
What was it you went on when you made these statements?
What basis did you have? A. Lots of times, time and again,
I could get him to do a good deal for me. Q. Lots of times
you could go and get Mr. Sheridan to agree with you? A.
He agreed in a way; whether I said I controlled it, I couldn't
make him do anything. Q. Were there times he didn't
agree on the policy? A. Oh, you bet there was! Yes, sir.
Q. During the campaign, you had asked for things to be done
which he refused? A. Well, during the summer, up before
the Chicago convention. Q. Was there any change in your
relations after the Chicago convention than they were be-
fore? A. We were *friends;* we changed in working politics
together.''

He also testified that he considered it a favor to Sheridan
and Broxon and the ''Capital News'' when he was trying to
get them some business; that he did not know anything about
the stock and bonds of the ''Evening Capital News.''

It was stipulated that during the month of October there
was filed in the United States postoffice at Boise a statement
required by the laws of the United States, showing the owner-
ship of the stocks and bonds of the Capital News Publishing
Company, and that said statement did not show that A. R.
Cruzen had any interest at all in either the stocks or bonds

of said corporation; that said report was sworn to by Sheridan as manager of said newspaper.

Thereupon the defendant Cruzen rested.

Witness Storey was introduced in rebuttal and testified as to the conversation he had with Cruzen in regard to the attacks the "Capital News" made upon him as a candidate for the legislature at the primary election. He testified that after the conversation between Cruzen and Broxon the attacks by said newspaper ceased for a time, and that there were no more such attacks until the last issue of the paper before the primary election; that during the conversation between Cruzen and Storey, Cruzen led Storey to believe that there would be an effort made to stop those attacks. Such conversation was had prior to the interview between Thompson and Cruzen above referred to. It appears that Storey was nominated at the primaries, and that after his nomination the "Capital News" did not attack him further.

The foregoing is the substance of the evidence introduced on the trial so far as Cruzen was concerned. The attorney general thereupon offered in evidence the information and the exhibits attached thereto in the case of Broxon and Sheridan. No objection being made thereto, the same was received and counsel for Broxon and Sheridan declined to introduce any evidence whatever on their behalf. Thereafter the case was argued to the court by A. A. Fraser, Esq., on behalf of Cruzen, and the attorney general on behalf of the plaintiff. Counsel for Sheridan and Broxon declined to make any argument in the case, and the case was taken under advisement by the court.

Sheridan and Broxon, by their failure to answer after the demurrer to their first answer had been sustained, admitted the allegations of the information so far as they were concerned, and the court holds that said editorials and articles so published are contemptuous and defamatory of the court, and that said defendants are guilty of contempt of this court.

As to the defendant Cruzen, he admits that he was very friendly with Sheridan and Broxon and the "Capital News," had frequent interviews with them, visited the office of the

"Capital News" frequently; that Sheridan and Broxon came to his office at his call over the telephone; that they discussed the political policy of the paper; that the policy pursued was mostly in accord with the views of Cruzen; that candidates for political offices who sought favor with that paper consulted with Cruzen, and that the political policy pursued by the paper was substantially in accord with Cruzen's views; that he foretold what the policy of the paper would be in certain matters before it adopted such policy; that he told numerous persons, many of them the leading citizens of the state, that he controlled the political policy of that paper, and those statements are corroborated by the policy pursued by the paper, regardless of the testimony of Broxon, who was merely hired by the month to write for the paper, that he controlled its political policy. Broxon testified that he controlled and dictated the policy of the "Capital News" and was responsible for publishing the editorials and other articles on which this contempt proceeding is based. However, all of the testimony when taken together shows that that conclusion of the witness is not correct. He testified to a conclusion or ultimate fact. A conclusion or ultimate fact is established by probative facts, and the probative facts as revealed by all of the testimony do not establish the truth of that ultimate fact or conclusion testified to by him. The probative facts show that he did not alone control and dictate the policy of the "Capital News," nor that he was the only one responsible for the editorials and articles on which this contempt proceeding is based. The evidence shows that Broxon did not have that exclusive honor, but that Sheridan and Cruzen shared it with him. Broxon's testimony on that point is only his conclusion formed in his own mind, but the probative facts do not sustain him in that conclusion. One of the questions in this case is: Who is responsible for said publications? and that question must be determined by this court from all of the evidence, and not from the testimony of a single witness who swears to the bald conclusion that he is or is not responsible. The same may be said of Cruzen's testimony, wherein he stated that he had no control or influence in the publication

of said articles. However, the testimony shows that Sheridan was the owner and manager of said paper, and Broxon testified that he and Sheridan had no disagreements over the policies the paper should pursue; that he worked in absolute harmony with Mr. Sheridan; that he had consulted Sheridan and Cruzen in the last campaign; that the position the "Capital News" would take on public questions was sometimes discussed with Sheridan and sometimes not; that a case had never arisen where they had disagreed as to the policy of the paper, and simply because there were no disagreements between Sheridan and Broxon, Broxon evidently concluded, even though he were only an employee, that he controlled the political policy of that newspaper. The evidence shows that Cruzen and Sheridan were quite frequently together either at Cruzen's office or at Sheridan's office, and discussed politics; that Broxon worked in absolute harmony with Sheridan, and the evidence shows that Sheridan and Cruzen were in harmony on the general political policies of the paper and consulted very frequently together. Broxon admitted that he talked with Cruzen in regard to some of said articles after they were published but did not recollect whether or not he talked with him about them before they were published. He also testified that during the campaign he went to Cruzen's office, and that he did discuss some of those publications with Cruzen; that Cruzen doubted the advisability of publishing some of said articles and of what Broxon had said in them. Why doubt the advisability of publishing if the publication had already been made? Why should Cruzen doubt the advisability of anything Broxon said in those articles if he had no right to advise in the matter? Cruzen, as a witness for himself, admitted that he had told many people that he controlled the political policy of the "Evening Capital News." He apparently made those statements in regard to that matter when there was no inducement for him to misrepresent. However, he testified that he did it as a "political stunt"—whatever that may be. But all of the facts and circumstances surrounding the matter show that he was very much interested in the campaign, and was very frequently in consulta-

tion with Sheridan and Broxon, and that the ''Capital News'' advocated the political policy which was in accord with Cruzen's views, so far as said publications were concerned. He admits that he told many of the leading citizens of Boise and politicians that he controlled the ''Capital News,'' and office-seekers sought him instead of Sheridan and Broxon to procure the favors of that paper in their political aspirations. After informing so many people that he had control of the ''Capital News,'' it seems that he was willing to have that distinction until he was confronted by a contempt proceeding, and then he went on the stand and testified that he had been lying about his control of said paper, and testified to the effect that he had no influence or control over it. Taking Broxon's entire testimony, it does not corroborate Cruzen in his sworn statement that he exercised no influence in controlling the political policy of said newspaper, but does corroborate the statement made by Cruzen to many people to the effect that he did exercise some influence in the publication of said articles. Regardless of the positive sworn statement of Cruzen, the facts, circumstances and probabilities of the case are all against him, and clearly support the view that he was telling the truth when he told so many people that he was controlling the political policies of that paper during the last campaign, and not telling the truth when on the witness-stand. If a jury should find the defendant Cruzen guilty of criminal libel upon this evidence, in a proper action, we do not think any court would reverse the verdict on the ground of insufficiency of the evidence. Circumstantial evidence is often more convincing than direct evidence, and it is well recognized that the tongue of the politician often speaks falsehood. The testimony of a man who will go on the stand and admit that he is a common falsifier in matters where he had no great inducement to lie, ought not to be given much credence in regard to the same matters when the jail or a fine, or both, for contempt of court is staring him in the face as an actuating motive. From all of the evidence, we have no doubt whatever that Cruzen did influence the manager and editor of the ''Capital News'' in the publication of said articles, and

is guilty of wilful contempt of this court. The evidence in this case clearly shows that the contemptuous articles and editorials alleged in the information and proven in this case, and the continuous publication of such articles, are sufficient to justify this court in imposing a severe sentence; but in view of the fact that this is the first case of the kind that has ever been brought before this court, we are inclined to impose a light sentence, believing it will have the same effect on the defendants, as well as on the press generally, as would a more severe sentence.

It is therefore ordered and adjudged that the sentence and judgment of this court against said defendants be as follows:

That the defendant R. S. Sheridan be confined in the county jail of Ada county for a period of ten days, commencing on the second day of January, 1913, and that he pay a fine of $500, and if said fine be not paid within thirty days, that execution be issued for the collection of the same:

That the defendant C. O. Broxon be confined in the county jail of Ada county for a term of ten days, commencing on the second day of January, 1913, and that he pay a fine of $500, and if said fine be not paid within thirty days, that execution be issued for the collection of the same:

That the defendant A. R. Cruzen be confined in the county jail of Ada county for a period of ten days, commencing on the second day of January, 1913, and that he pay a fine of $500 and the costs of this proceeding, including clerk's fees, witness fees, stenographer's fees, and the expenses of the bailiff in the service of process and papers in this proceeding, and if said fine and costs be not paid within thirty days, that execution be issued for the collection of the same.

Stewart, C. J., concurs.

Ailshie, J., concurs in part and dissents in part.

AILSHIE, J., Concurring in Part and Dissenting in Part. In view of the public importance of this matter and the fact that it is the first of its kind in this court, I deem it my duty

to briefly express my views both as to the law and the facts of the case.

I think the press as well as the people generally of this state desire the orderly and unobstructed administration of the laws of the land in this jurisdiction, and for that very reason I deem it important that in this, the first case of its nature to arise in the state, the law obtaining here should be clearly and definitely stated. If that be done, those who respect the law will observe it, and those who disregard or hold it in contempt will know the consequences of their action. So far as I am aware, no court among English-speaking peoples has ever wholly denied the right or power of the courts to punish for contempt. This power is not given to or assumed by courts for the protection of the judges. They as individuals have the same protection under both the civil and criminal laws that the law gives to every citizen. This power is conferred by the people themselves when they create courts, and is exercised by the courts as the constituted agencies of society for the preservation and efficient service of that department of government in order that the administration of justice as between litigants, on the one hand, and litigants and the people on the other hand may not be embarrassed, delayed, impeded or swerved from the true course of law and justice by intimidation, charges or threats of any kind. The judicial department of government necessarily occupies a different position from either of the other departments, and, owing to the nature of its duties, must discharge them chiefly in public sittings and hearings which should be as nearly as possible orderly and free from bias, prejudice, fear or resentment.

There are well-defined grounds on which there is no dispute or controversy as to the powers and duties of courts. the whole difficulty arises in this class of cases as to just where the boundary line lies beyond which the power ceases and the court should not go. It is true that this power may be and sometimes has been abused; it is also true that wherever power is lodged it may be abused, but the possibility or danger of abuse of power is no argument in favor of abolishing all

power and the agencies exercising the authority of organized society. No one, I presume, would contend for a moment that a court cannot, by summary process, protect itself against an assault and attempt to drive its judges from the bench and break up its sessions. The court could immediately order the arrest and punishment of such person. This is not an unheard of or improbable thing, as it has actually occurred in American courts. Likewise a witness who refuses to testify to material facts in a case may be summarily dealt with. These illustrations merely serve to show that the power does exist beyond all question.

The real debatable ground is reached when it comes to dealing with writings, utterances and publications concerning the acts and proceedings of courts and the judges of courts. In that field there is a great diversity of opinion among the courts, lawyers and laymen as well. In this case I do not consider it necessary to travel into any doubtful or uncertain field of legal speculation, for the reason that the publications are all admitted, and it is clear to me that more than one of them charges the court with corruptly deciding a case against law for political purposes and of becoming a party to a political conspiracy. As I understand the law, it is well settled that to charge a court with venality or corruption in litigation then before the court constitutes contempt, for the reason that it embarrasses, impedes or tends to render more difficult and uncertain the administration of justice in that particular case. Judges are only men vested with the authority of the state for the time being, and they are human like other men. However honest, courageous and just they may be, they are still liable to be prejudiced, whether consciously or unconsciously, one way or the other by such utterances and publications. Again, I presume they, in common with most men, like to merit the esteem, confidence and goodwill of the people and community at large, and to threaten them in advance with the opposition and displeasure of an influential press if they decide a case in favor of a particular litigant, and that if they do so they will be charged and denounced as the tools of the criminal class, while it may in no

way affect the final judgment in the case, does most assuredly place an added obstruction and impediment in the way of administering unprejudiced and unbiased judgment in that case. Such charges will constitute as much, if not more, of an obstruction and impediment in the administration of justice if made after a decision has been reached and while a petition for rehearing is pending. In such case, the petition should be examined and considered and passed upon deliberately and dispassionately. Does any reasonable person suppose for a moment that a court presided over by live human agencies can as easily, fairly and impartially consider an application for a rehearing and the arguments in favor of a reversal or modification of its previous judgment when at the same time it is laboring under the charge made broadcast that its original decision was entered through conspiracy and corruption of the judges, as it could consider such application if no such charges had been made? This proposition needs no argument with thinking people. What I have already said has reference to *charges of corruption* on the part of the court made through the press,—it has no reference to *criticism* or *censure* of either the court or the judges of the court. Criticism, censure and protest are lawful.

As I view the matter in the light of our constitution (sec. 9, art. 1), there can be no contempt of court in the criticism of the court or its judges for any action taken officially or otherwise. No liability or penalty attaches for ''freely speaking, writing and publishing on all subjects,'' so long as the privilege is not *abused,* but the constitution says all persons shall be held *''responsible for the abuse of that liberty.''* (Sec. 9, art. 1.) This grants a *liberty* and not a *license;* it must be exercised like all other constitutional rights, with due regard to the rights of every other individual and of society at large. The right to acquire and hold property is also a constitutional right, but no one would seriously contend that such guaranty confers any right on the citizen to go out and take the property of another,—it must be *lawfully acquired.* There is a wide difference between criticism, discussion and arraignment of the acts and conduct of an individual

or official on the one hand, and straight-out charges of corruption and crime on the other,—the one falls within the bounds of discussion and debate which is lawful and legitimate; the other comes within the domain of accusation and vituperation, and is unlawful. The one sheds light and intelligence on the subject; the other turns off the light of discussion and reason descends to epithets and generates prejudice alone.

In the case before us, it is clear to me that the defendants are not liable for any criticism they may have indulged in with reference to the court or judges or the court's decision; neither do I think they could be held for contempt in simply publishing press dispatches of the comments of any one on the decision of this court. In my judgment, in order for a publisher to become liable as for contempt in publishing a press dispatch or news item, the article must first be libelous and contemptuous, and, in the second place, the paper must have in some way used and published it as expressing the publisher's own sentiments or repeated or reiterated it after it ceased to be mere *news*. In other words, there must be something about such a publication to indicate wrongful or malicious purpose in the publication. A news-gathering agency, such as a great daily press, may at times publish news items with no thought or intention of prejudicing, obstructing or embarrassing the administration of justice, although it does have that effect, and still I think the mere publication would be no contempt. After all, so far as I can see in this case, it must get back to the one proposition, namely, that the defendants here passed beyond the mere publication of news items and press dispatches and beyond mere criticism of the court and its judges and beyond arraignment of the court for its action in a case pending, and have, in unmistakable language, charged the court with such corruption and venality as, if true, should be sufficient to impeach every judge on the bench. This falls within the law of contempt as everywhere recognized and observed, and no authority to the contrary has been cited by counsel for the defendants.

This brings me to the question as to who is responsible for these publications. Defendants Sheridan and Broxon admit the authorship and responsibility. The defendant Cruzen, however, denies all responsibility, and denies that he has any interest in the paper in which the publications were made, or influence with the owner or editor thereof. The evidence shows that during the last six or eight months Cruzen has stated and represented to a great many reputable and responsible citizens of the state that he controlled the political policies of the "Capital News"; he admits on the witness-stand that he did make such statements and representations, but says they were not true and that they were made for mere "political effect," and were "political stunts" made for the purpose of gaining advantage for the political cause, policies and interests he was representing. He testifies, among other things, as follows:

"Q. If you did state to any of these gentlemen contained in this agreement of facts that you controlled the 'Capital News' and were running it for what there was in it for you, then you were telling them what wasn't true?

"A. It was a political stunt.

"Q. What?

"A. A political stunt.

"Q. What do you mean by a political stunt?

"A. Well, I was just getting all the water on my wheel I could on my side.

"Q. Will you explain what you mean by getting water on your wheel?

"A. I wanted to get all the votes I could for the crowd I was for.

"Q. If you made that statement, was it true or false?

"A. It was a political statement.

"Q. You won't say on oath it wasn't true, when you made that statement?

"A. Of course, I realize how this is, as I say: Of course—you know with politics, if you tell everything you know, you would be in a weak position; you might put it down I didn't tell the truth. . . . . Well, if I made that statement—

and I did make it, for I have no recollection of that statement; they were on the other side.

"Q.   Answer my question. . . . .

"A.   I don't remember ever talking to them, although I might; you see—

"Mr. FRASER: If you made the statement, was it true or false?

"A.   Why, it wasn't true; it was just politics."

Broxon testifies that he wrote the articles and that they were not dictated or inspired by Cruzen, and that he did not take instructions or receive directions in any matter from Cruzen. Cruzen denies that he ever saw the articles or knew anything of them until after they were published and he saw them in the paper. In this state of the evidence, we are obliged to either believe the statements and representations he made during a political campaign and disbelieve his testimony, or else take the evidence here given under oath and assume that he was making false statements and representations during the campaign in order to further and advance the claims and interests of a political organization of which he was a leading spirit. In cases of this kind, the evidence should be clear and convincing in order to justify a court in punishing for contempt. I cannot think the evidence produced makes a case against Cruzen. It is not shown by the proofs that he owns any interest in the paper or controls its policy in any matter, or that he inspired the articles in question or knew of them prior to their appearance in the paper. I therefore dissent from the conclusion of my associates in finding Cruzen guilty of contempt.

As to the defendants Sheridan and Broxon, the evidence shows that they have overstepped the bounds of the law in so far as they charged the court in a pending case with corruption and criminal motives in hearing and deciding the case. In this they clearly passed beyond the constitutional right of *free speech* and a *free press*. On the other hand, I do not think there was any contempt or infraction of the law in publishing the news and press dispatches and criticis-

ing the court or any of its judges, or taking issue with the court in its reasoning or conclusions.

This brings me to a consideration of the penalty which ought to be imposed in this case, and here I am again unable to agree with my associates. I think the penalty too severe, and dissent from that part of the judgment ordering the defendants' imprisonment. There is no way provided by law whereby a case of this kind can be tried and punishment inflicted except by the judges of the court in which the contempt was committed. For this very reason I think the court should be extremely careful not to inflict any penalty which can carry with it the least inference of the arbitrary exercise of its power or that might seem disproportionate to the offense committed. The real grounds for any contempt proceeding of this kind is the preservation of the fair and orderly administration of justice and the authority of the duly constituted tribunal for that purpose, and the assertion and maintenance of that authority is the chief object of such proceedings rather than to mete out that which in the criminal law might be regarded as an adequate and commensurate punishment. These defendants have never previously been before the court on such a charge, and the offense in this case was committed in the heat and excitement of an unusual, if not unparalleled, political contest, and while that is not a justification, it is to my mind a mitigating circumstance worthy of consideration. In the anxiety to win in such contests men sometimes do things their own more deliberate judgment would disapprove and condemn. I think a reasonable fine against the defendants Sheridan and Broxon is all that should be imposed in this case, and I accordingly dissent from the judgment of imprisonment.